Thomas T. SWISHER, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 14178-1.

United States District Court
W. D. Missouri, W. D.

Jan. 25, 1965.

Wyman Wickersham, Kansas City,. Mo., for petitioner.

Clifford M. Spottsville, Asst. U. S.. Atty., Kansas City, Mo., for respondent..

JOHN W. OLIVER, District Judge..

## Introduction

The history of petitioner's most recent effort to obtain a post-conviction reversal of his Court-Martial conviction will aid in understanding our treatment. and disposition of this latest petition for writ of habeas corpus. The general factual background is stated in Swisher v. United States, W.D.Mo.1962, 211 F.. Supp. 917 and in Swisher v. United States, 8 Cir.1964, 326 F.2d 97. Those reported decisions do not reveal that both this Court and the Court of Appeals have considered numerous other applications that petitioner had filed in which he had prayed for some form of judicial relief.[1]

On June 21, 1963, the Court of Appeals entered an order in its Case No. 17372 (subsequently reported in 326 F. 2d 97, as above noted) in which it reviewed various orders it had made in regard to various proceedings petitioner had attempted to commence in that court.. The Court of Appeals considered what. it described as "a folder of voluminous. papers, stapled together, and entitled'

---

1. In an order entered April 10, 1963, in Misc. No. 199, for example, the Court of Appeals took note that "petitioner has heretofore been permitted to file at least six separate petitions for a writ of habeas corpus in the United States District Court for the Western District of Missouri." That order transferred to this Court a particular petition that petitioner had attempted to file directly in the Court of Appeals,

by him [the petitioner] 'Motion for a Writ of Mandamus' ". That order stated that the Court of Appeals would "treat and give effect to Swisher's papers here as an application for leave to appeal in forma pauperis from the District Court's order making denial of his habeas corpus application, upon the question whether the Court erred in making denial of the application without a hearing."

That order further stated, as later noted on page 97 of 326 F.2d, that "leave to appeal in forma pauperis will be granted for the purpose of settling the question of Swisher's right to a hearing on his mental competency, and of attempting to put an end to his continuous applications for a writ in the District Court and his repetitive applications for a writ of mandamus here."

Request for appointment of counsel was initially denied in the Court of Appeal's order of July 14, 1963, but on July 24, 1963, on a further application of petitioner, the Court of Appeals appointed Wyman Wickersham, Esq.[2] of the Kansas City, Missouri, Bar "to serve as counsel for him in preparing briefs particularly on the following questions:

"1. Is there any provision in the Military Justice Code for making collateral attack against a conviction and sentence on the ground that the defendant was mentally incompetent to stand trial?

2. Mr. Wickersham, as noted in footnote 2 on page 98 of 326 F.2d, became and has continued as employed counsel. He and counsel for the Government are highly commended for their cooperation and for their respective presentations on behalf of the parties represented.

3. No specific orders were made by the Court of Appeals in connection with other motions and requests that then pended. The confusion produced by piecemeal litigation is illustrated by the Court of Appeals later statement that "[t]he District Court dismissed appellant's petition for a writ, without requiring response to be made thereto by the Warden of the Medical Center for Federal Prisoners * * *." (page 97 of 326 F.2d).

"2. If the Military Justice Code is without such remedy, does any right exist to make such an attack against a military conviction and sentence in the civil courts?

"3. If such jurisdiction exists in the civil courts, was the District Court required to hold a hearing and make a determination on appellant's claim of such incompetency in the present situation?"

The Court of Appeals ordered that the appeal would be heard on the files and records of the District Court and that "all other motions or requests contained in other proceedings that then pended" were overruled.[3]

The opinion of the Court of Appeals did not reach the questions it had ordered briefed in its order of July 24, 1963. The Court of Appeals concluded from its review of the records before it, some of which were not before this Court, that a "possible issue" existed relating to whether petitioner's "mental competency to stand trial may not have been constitutionally adjudicated at his court martial." The Court of Appeals added that "[w]e cannot presently dispose of that possible issue on the basis of the record before us" (page 97 of 326 F.2d) and remanded the case "for further proceedings in accordance with due process of law" (page 98 of 326 F.2d).

No rules to show cause was ever issued in our case No. 14178-1 for the reason that we had issued such an order on April 16, 1962 in petitioner's case No. 13822-1. The Warden of the Medical Center made full response to that order to show cause on April 25, 1962. In an attempt to keep even with the flood of papers filed by petitioner, we eventually consolidated all of petitioner's cases and directed that all new applications and papers be filed in a single case; that file was eventually forwarded to the Court of Appeals. We state the facts concerning the response filed by the Warden to our rule to show cause in order that it not appear that he ignored an order of this Court.

■ After the mandate from the Court of Appeals was filed in this Court, we convened a series of both formal and informal pre-trial conferences in order to insure that all possible material and relevant evidence be made a part of an entirely new and complete record. Sanders v. United States, 373 U.S. 1, 22, 83 S.Ct. 1068, 1081, 10 L.Ed.2d 148 (1963), teaches that one possible solution to the problem of repetitious post-conviction applications is an "imaginative handling" of a particular complaint in order "to ascertain all possible grounds upon which the prisoner might claim to be entitled to relief."

Petitioner was accordingly granted leave to file an amended petition for writ of habeas corpus under instructions to include every possible ground upon which the petitioner might claim to be entitled to relief. As a result of the conferences between the Court and counsel, a stipulation and a supplemental stipulation were executed and filed. The exhibits attached to those stipulations are voluminous and, as we shall detail later, both parties agreed that there is no other evidence that either party wanted to adduce.

Petitioner's amended petition, for the reasons stated, alleged every possible ground for relief. Petitioner's briefs, however, concentrated on the particular issues to which we shall first direct attention.

### Scope of Review in Habeas Corpus Involving a Military Prisoner

■ In one of our memorandum opinions involving an earlier petition for habeas corpus filed by the present petitioner we noted that in order to decide that case we were "not required to determine whether the scope of review of a District Court over court-martial proceedings is the same as the scope of its review over civil trials" (page 918 of 211 F.Supp.). We also noted, however,

in Footnote 2 on page 918 of 211 F.Supp., that Judge Wisdom, in Rushing v. Wilkinson, 5 Cir.1959, 272 F.2d 633, 641, cert. denied 364 U.S. 914, 81 S. Ct. 280, 5 L.Ed.2d 229, had suggested that "[a] strong case could be made to show a trend in [the] direction. * * that the scope of collateral review of military trial should be as broad as the scope of collateral review of a civilian trial." [4]

As the point must be reached in this case, we now hold, as Judge Wisdom held in Rushing, that Hiatt v. Brown, 339 U.S. 103, 111, 70 S.Ct. 495, 94 L.Ed. 691 (1950); Ex Parte Reed, 100 U.S. 13, 23, 25 L.Ed. 538 (1879); Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), and other cases we shall presently discuss, definitely determine that the scope of review on habeas corpus is more narrow in cases involving military prisoners than it is in cases involving civil prisoners.

Hiatt v. Brown, supra, involved a court-martial conviction for murder. The district court's grant of habeas corpus was affirmed by the Court of Appeals. The Supreme Court reversed. The Supreme Court noted in Footnote 6 on page 110 of 339 U.S., on page 498 of 70 S.Ct., that the Court of Appeals had cited the following instances of error in the military proceedings that had been reviewed by the District Court:

"(1) Accused was convicted on the theory that although he was on duty as a sentry at the time of the offense, it was incumbent upon him to retreat from his post of duty.

"(2) Accused has been convicted of murder on evidence that does not measure to malice, premeditation, or deliberation.

"(3) The record reveals that the law member appointed was grossly incompetent.

346 U.S. 137, 148, 73 S.Ct. 1045, 97 L. Ed. 1508, and the second at 346 U.S. 844, 74 S.Ct. 3, 98 L.Ed. 363.

---

4. In addition to the authorities cited by Judge Wisdom, see in particular Mr. Justice Frankfurter's dissenting opinions in Burns v. Wilson, the first reported

"(4) There was no pre-trial investigation whatever upon the charge of murder.

"(5) The record shows that counsel appointed to defend the accused was incompetent, gave no preparation to the case, and submitted only a token defense.

"(6) The appellate reviews by the Army reviewing authorities reveal a total misconception of the applicable law."

In regard to those errors the Supreme Court noted that the Court of Appeals had considered that such errors were within the proper scope of review and that it had "concluded that certain errors committed by the military tribunal and reviewing authorities [referring to those just quoted from Footnote 6] had deprived respondent of due process." Hiatt definitely held that consideration of whether there had been a compliance within the due process clause was beyond the scope of proper habeas corpus review by a District Court in military cases. On page 110, 70 S.Ct. on page 498 it was held:

"We think the court was in error in extending its review, for the purpose of determining compliance with the due process clause, to such matters as the propositions of law set forth in the staff judge advocate's report, the sufficiency of the evidence to sustain respondent's conviction, the adequacy of the pre-trial investigation, and the competence of the law member and defense counsel."

And, on page 111, 70 S.Ct. on page 498, the rule of In re Grimley, 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636

(1890), was reaffirmed in the following language:

"It is well settled that 'by *habeas corpus* the civil courts exercise no supervisory or correcting power over the proceedings of a court-martial * * *. The single inquiry, the test, is jurisdiction.' In re Grimley, 1890, 137 U.S. 147, 150 [11 S.Ct. 54, 34 L.Ed. 636]. In this case the court-martial had jurisdiction of the person accused and the offense charged, and acted within its lawful powers. The correction of any errors it may have committed is for the military authorities which are alone authorized to review its decision."

Whelchel v. McDonald, 340 U.S. 122, 71 S.Ct. 146, 95 L.Ed. 141 (1950), and Gusik v. Schilder, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950), were decided on the same day and later in the same year (1950) that Hiatt was decided. Whelchel involved an attempted review by habeas corpus of a court-martial conviction for rape. The Supreme Court affirmed the Court of Appeals affirmance of the District Court's denial of the writ. Mr. Justice Douglas held that "[t]he main point presented by the petition for certiorari is whether the military tribunal that tried petitioner was deprived of jurisdiction by reason of its treatment of the insanity issue tendered by petitioner" (page 123 of 340 U.S., page 147 of 71 S.Ct.). It must also be noted that in that case "[t]he defense of insanity was not raised * * * either at the pretrial investigation or the trial itself."[5]

The Supreme Court, however, noted that *opportunity* to raise the defense of insanity both before, during, and after trial, were afforded by the military

5. It is apparent from the opinion of the Court of Appeals in Whelchel that a harder set of facts was involved there than are alleged in this case because, in Whelchel, the prisoner claimed that he had been denied due process because "[t]he reviewing authorities failed, on notice of the probable insanity of the accused *at the time* of the offense *and of*

*his trial*, to halt the execution of his sentence and have a thorough psychiatric examination made of him" (page 261 of 176 F.2d, emphasis ours). No such claim is alleged in this case. As will be noted later, petitioner was given numerous psychiatric examinations, both before and after court-martial.

law. It was for that reason it held that no issue of due process need be considered. Specifically, the Supreme Court held:

"We put to one side the due process issue which respondent presses, for we think it plain from the law governing court-martial procedure that there must be afforded a defendant at some point of time an opportunity to tender the issue of insanity. It is only a denial of that opportunity which goes to the question of jurisdiction. That opportunity was afforded here. Any error that may be committed in evaluating the evidence tendered is beyond the reach of review by the civil courts."

In Whelchel's case, the district court had, in fact, received evidence on the question of whether the prisoner "may have been * * * insane * * * at the time of the crime" (page 124 of 340 U.S., page 148 of 71 S.Ct.). The second opinion of the Court of Appeals for the Fifth Circuit, reported in 178 F.2d 760, shows that the Court of Appeals' final order affirming the district court's denial of the writ was delayed until after the prisoner had been afforded an opportunity to apply for a new trial to the Judge Advocate General under Article of War 53.

Relief by the Judge Advocate General was denied. The Supreme Court took note of that fact as follows:

"The Judge Advocate General reviewed all the evidence on the insanity issue which petitioner had tendered both to the military authorities and to the District Court in the habeas corpus proceeding and concluded 'I entertain no doubt that Whelchel was so far free from mental defect, disease, and derangement as to be able concerning the particular acts charged both to distinguish right from wrong and to adhere to the right. * * *'"

In determining that judicial examination of that factual determination was not within the proper scope of review on habeas corpus involving a military prisoner, the Supreme Court held:

"Any error by the military in evaluating the evidence on the question of insanity would not go to jurisdiction, the only issue before the court in habeas corpus proceedings."

As we shall state in infinite detail later, the record in this case establishes that practically all of the evidence that petitioner would have us review in support of a requested present judicial factual finding that the prisoner was insane at the time of the offense, was fully and repeatedly presented to the military authorities for their consideration and judgment. We mention that fact now in order to put in focus the proposition that under the rule of Whelchel it would seem that any error that may have been committed by the military in evaluating the evidence is not properly within the scope of our review in this habeas corpus proceeding.

Gusick's case involved a court-martial conviction for murder. It did not rule any question particularly involved in the case at bar. It established the proposition that a military prisoner must exhaust his administrative remedies before a federal court would exercise any habeas corpus jurisdiction in his favor. In defining the area in which the Congress legislates when it passes legislation relating to military law, the Supreme Court held:

"Congress was legislating as respects tribunals over which the civil courts have traditionally exercised no power of supervision or review. See In re Grimley, 137 U.S. 147, 150 [11 S.Ct. 54, 34 L.Ed. 636]. These tribunals have operated in a self-sufficient system, save only as habeas corpus was available to test their jurisdiction in specific cases."

In Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), involving a court-martial conviction for rape, the Supreme Court, by a four man opinion written by Chief Justice Vinson,

affirmed the Court of Appeals' affirmance of the District Court's action in dismissing the applications for habeas corpus without a hearing. (See Burns v. Lovett, 104 F.Supp. 311 for the opinion and action of the District Court).

The charges in the applications for habeas corpus were indeed serious. On page 138 of 346 U.S., on page 1047 of 73 S.Ct., they were described as follows:

"In these applications petitioners alleged that they had been denied due process of law in the proceedings which led to their conviction by the courts-martial. They charged that they had been subjected to illegal detention; that coerced confessions had been extorted from them; that they had been denied counsel of their choice and denied effective representation; that the military authorities on Guam had suppressed evidence favorable to them, procured perjured testimony against them and otherwise interfered with the preparation of their defenses. Finally, petitioners charged that their trials were conducted in an atmosphere of terror and vengeance, conducive to mob violence instead of fair play."

The Supreme court recognized that "the case poses important problems concerning the proper administration of the power of a civil court to review the judgment of a court-martial in a habeas corpus proceeding" and that the court was "dealing with habeas corpus applicants who assert—rightly or wrongly —that they have been imprisoned and sentenced to death as a result of proceedings which denied them basic rights guaranteed by the Constitution" (page 139 of 346, page 1047 of 73 S.Ct.).

The Supreme Court made clear at the outset that the question of the scope of review in military prisoner habeas corpus cases was not a question of "jurisdiction" in the sense that jurisdiction is generally understood. The Supreme Court explained that the real question related to the manner in which the admitted power, or "jurisdiction" of a District Court, should be exercised. On page 139, 73 S.Ct. on page 1047 it was stated:

"The federal civil courts have jurisdiction over such applications [for habeas corpus filed by prisoners convicted by court-martial]. By statute, Congress has charged them with the exercise of that power. Accordingly, our initial concern is not whether the District Court has any power at all to consider petitioners' applications; rather our concern is with the manner in which the Court should proceed to exercise its power."

In Burns the Supreme Court reaffirmed the basic rationale of Hiatt. It held that rules of decision applicable to habeas corpus applications involving civil prisoners were not to be applied in habeas corpus proceedings involving military prisoners. On page 139, 73 S.Ct. on page 1047, it was specifically held:

"[I]n military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases. Hiatt v. Brown, 1950, 339 U.S. 103 [70 S.Ct. 495, 94 L.Ed. 691]. Thus the law which governs a civil court in the exercise of its jurisdiction over military habeas corpus applications cannot simply be assimilated to the law which governs the exercise of that power in other instances. It is *sui generis;* it must be so, because of the peculiar relationship between the civil and military law."

Burns discussed in detail the action that the Congress has taken to provide a complete system of review within the military system to secure rights guaranteed by the Articles of War and by the Uniform Code of Military Justice. In summary, the opinion stated that:

"The revised articles, and their successor—the new Code— * * * establish a hierarchy within the military establishment to review the convictions of courts-martial, to ferret out irregularities in the trial,

and to enforce the procedural safeguards which Congress determined to guarantee to those in the Nation's armed services. And finally Congress has provided a special post-conviction remedy within the military establishment apart from ordinary appellate review, whereby one convicted by a court-martial, may attack collaterally the judgment under which he stands convicted."

Because of the very existence of this Congressional system of review the Supreme Court held that "[i]n military habeas corpus cases * * * it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted."

And more significantly, so far as the case at bar is concerned, the court held that "when a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence."

Burns, of course, recognized that if a claim had not been presented to the military authorities it could not be said that such a claim could have been "fully and fairly" dealt with by them. It is in those cases, and in cases where claims were presented to a military court but the military court refused to consider them, that the rule of Burns apparently would require a hearing by a District Court.

On this point, Burns held:

"Had the military courts manifestly refused to consider those claims, the District Court was empowered to review them de novo. For the constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect soldiers—as well as civilians—from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimen-

tary fairness rather than finding truth through adherence to those basic guarantees which have long been recognized and honored by the military courts as well as the civil courts."

Burns involved a case where no new claim was made in the application for habeas corpus before the District Court that had not already been presented to the military courts. The problem presented by that case therefore required a determination, from the face of the military records, of whether the claims of the petitioners had been fully and fairly considered by the military. In that regard the Supreme Court held:

"These records [referring to the full military proceedings, including the denial of petitioners' applications for new trial under Article 53] make it plain that the military courts have heard petitioners out on every significant allegation which they now urge. Accordingly, it is not the duty of the civil courts simply to repeat that process—to re-examine and reweigh each item of evidence of the occurrence of events which tend to prove or disprove one of the allegations in the applications for habeas corpus. It is the limited function of the civil courts to determine whether the military have given fair consideration to each of these claims."

Accordingly, the Court of Appeals for the District of Columbia Circuit was affirmed although the Supreme Court indicated that it had exceeded the proper scope of review permitted by law. In that regard, the Supreme Court held:

"We think that although the Court of Appeals may have erred in re-weighing each item of relevant evidence in the trial record, it certainly did not err in holding that there was no need for a further hearing in the District Court."

Burns is the law of the land. That case and its rationale was followed in Fowler v. Wilkinson, 353 U.S. 583, 584,

77 S.Ct. 1035, 1 L.Ed.2d 1054 (1956).⁶ In Reid v. Covert, 354 U.S. 1, 37, 77 S.Ct. 1222, 1241, 1 L.Ed.2d 1148 (1957), Mr. Justice Black directed a comparison to Burns in a footnote following his suggestion that "[a]s yet it has not been clearly settled to what extent the Bill of Rights and other protective parts of the Constitution apply to military trials." But such a comment does not change the controlling effect of Burns and the other Supreme Court cases cited.

### Problem Created By Direction of Our Court of Appeals on Remand

We have been directed to make further inquiry into what the Court of Appeals concluded was a "possible issue" concerning petitioner's alleged incompetency at the time of trial.[7] The Court of Appeals held:

> "Our conclusion is that appellant has set forth therein [referring to the *ex parte* record before the Court of Appeals] some factors which give facial indication of a possible issue existing, that his mental competency to stand trial may not have been constitutionally adjudicated at his court-martial" (page 97 of 326 F. 2d).

In an earlier opinion we stated in Footnote 1 on page 918 of 211 F.Supp. that "it should * * * be noted that the Board of Review stated that 'it was expressly stipulated that there was no issue of insanity *at the time of trial*'"

(emphasis in our original opinion). That quotation was taken from pages 3–4 of a copy of the Board of Review's decision of June 4, 1959, which had been furnished us by the Warden of the Medical Center in response to our rule to show cause.[8] An identical copy of that decision appears on pages 55 to 60 of Exhibit D-2 of the present record (the exact quotation appears on pages 57–58 of Exhibit D-2, which are pages 3–4 of the decision.)

The Court of Appeals evidently had a copy of the Board of Review's decision before it on April 10, 1963, because specific quotation of the same portion of the Board of Review's decision that we had earlier quoted in our memorandum opinion of December 13, 1962 was made in its Case Misc. No. 199. In that case the Court of Appeals had under review our action of December 31, 1962 denying an earlier petition (that is the case reported in 211 F.Supp. 917) together with five other petitions that petitioner had either appealed to or had filed directly in the Court of Appeals.

In Case Misc. No. 199, on April 10, 1963, the Court of Appeals stated:

> "In the petition for a writ filed in the District Court on December 12, 1962, petitioner stated that 'At the time of conviction, the plea of not guilty by reason of insanity was entered for me, against my own wishes.' The question of petitioner's sanity at the time of the com-

---

6. Immediately after a quotation from Burns, Mr. Justice Clark in Fowler added: "If there is injustice in the sentence imposed [by the court-martial] it is for the Executive to correct, for since the board of review has authority to act, we have no jurisdiction to interfere with the exercise of its discretion. That power is placed by the Congress in the hands of those entrusted with the administration of military justice, or if clemency is in order, the Executive." (page 584 of 353 U.S., page 1036 of 77 S.Ct.).

7. The Court of Appeals noted, apparently with approval, that we had "cogently recognized" in an earlier opinion regarding petitioner "[t]hat the issue of 'men-

tal competency *at the time of the offense and at the time of trial* are entirely different questions of fact'" (page 97 of 326 F.2d). We recently explored various ramifications of that subject more fully in United States v. Sermon, W.D. Mo.1964, 228 F.Supp. 972.

8. See footnote 3 above in which we attempted to correct any erroneous inference that the authorities at Springfield Medical Center had not responded to the order to show cause issued by this Court on April 16, 1962. In fact, additional data concerning petitioner's military records was furnished by the Medical Center from time to time without the necessity of issuing any order at all.

mission of the offenses involved was one of the principal issues tried by the General Court-Martial and reviewed by the Board of Review. *In the Board of Review's decision, it was stated, however, that 'it was expressly stipulated that there was no issue of insanity at the time of the trial.'* (Emphasis ours).

No direct attack was ever made of the accuracy of the quotation we made from the Board of Review's decision in any of the numerous petitions filed by petitioner in this Court. Indeed, the attack made in regard to the quoted portion of the Board of Review's decision that petitioner most recently made in the Court of Appeals was somewhat oblique.[9] The second of fifteen grounds of complaint in the Court of Appeals stated that "the defense counsel failed to attack by motion the jurisdiction of the court on the grounds that: a. The accused was incompetent to stand trial. * * * *"

In the last of the fifteen grounds urged in the Court of Appeals petitioner stated:

> "That the Law Officer, the court and counsel did not act on the question of sanity of the Appellant at the time of trial as shown by the following excerpt from the transcript. (T. 72–73)
>
> * * * * * *
>
> "'LAW OFFICER: Now, as to the instructions on insanity, I intend to instruct on mental responsibility. The question arises now as to mental capacity. Is the accused's mental capacity at this time in issue?
>
> "'DEFENSE: You mean so that he can participate in his own defense?
>
> "'LAW OFFICER: Yes.
>
> "'DEFENSE: The defense is not making that an issue, sir.

> "'PROSECUTION: Sir, I feel that it was raised by some of the defense witnesses, that the man was and is insane, which was in the issue of sanity.
>
> "'LAW OFFICER: I'm afraid that some of the psychiatric testimony got into that question as to the accused's sanity at the present time, which would raise the question of mental capacity. However, since the defense is not raising that point and no motion has been made, it shouldn't be necessary to instruct on that.'
>
> * * * * * *
>
> "This has been construed as a stipulation yet it is not a stipulation and the accused did not participate in it and there is no showing that the accused was present at this side Bar conference. We again pose the question how can sanity be stipulated?"

Petitioner argued in the Court of Appeals that:

> "The Appellant's right to attack a conviction because of incompetency at the time of trial is preserved to him in the civil courts on petition for a writ of habeas corpus. If collateral attack of a conviction on ground of incompetency to stand trial was available within the military justice system, then that system has abused its rights and discretion to the extent that Appellant's constitutional rights have been infringed upon."

The Court of Appeals' opinion obviously did not consider that the opportunity admittedly available under military law for petitioner to have raised the question of insanity at the time of trial, as that law is fully discussed and described in Whelchel v. McDonald, *supra*, was sufficient "to put to one side the due process issue," (to borrow Mr.

9. On the first page of petitioner's suggestions in support of his amended petition for habeas corpus, we were directed to the briefs filed by petitioner in the Court of Appeals. We would not, of course, have considered petitioner's briefs filed in the Court of Appeals had we not been specifically requested to do so.

Justice Douglas' words from page 124 of 340 U.S., page 148 of 71 S.Ct.). The Court of Appeals' opinion did not suggest what factors in the record before it gave a "facial indication of a possible issue existing, that his mental competency to stand trial may not have been constitutionally adjudicated at his court-martial" (page 97 of 326 F.2d), but it is clear that the Court of Appeals sent the case back to us "for further proceedings in accordance with due process of law" (page 98 of 326 F.2d).

Compliance with our Court of Appeal's direction obviously requires something more than the action taken by the District Court in Burns. We must assume that the Court of Appeals considered that this case belonged in the category of the exceptional case that Burns suggested a hearing would be required; else the Court of Appeals would have decided the case on the merits without remanding it to this Court.

■ Consistent with that thought, we believe that we must search and review the military proceedings *de novo* in order to determine whether the manner in which petitioner's mental competency was handled either denied him a fair trial, or otherwise deprived him of some right guaranteed him under the Constitution.[10]

### Inquiry Is Not Whether Petitioner Was Mentally Ill at the Time of Trial

■ An application of the broadest sort of *de novo* review of the record in this case does not involve the making of a retrospective determination of whether petitioner was mentally ill at the time of trial. It must be understood at the outset that petitioner, like any other accused, may well have been mentally ill at the time of trial, but could still have been quite competent to stand trial. In other words, it must constantly be kept in focus that mere proof of the fact that petitioner may have been in fact mentally ill at the time of trial does not establish that he was then mentally incompetent to stand trial. Proof of such a fact would establish only one circumstance to which judicial attention must be directed; such proof does not establish anything more.

■ Most, if not all the legal and medical confusion that unfortunately characterizes many of the cases involving mental competency, as distinguished from the entirely different question of criminal responsibility, is the result of efforts to sustain an absolute concept that a particular defendant is not competent to stand trial simply because he may be correctly diagnosed as being mentally ill at the time of his trial.

Petitioner's basic contention in this case is an excellent example of the absolutist rationale. On page 11 of his reply brief petitioner asserts that the facts revealed by this record establish that "petitioner has been mentally ill all of his life * * * [and that] an almost unequalled number of psychiatric evaluations from childbirth to the present [establish] one conclusion: mental abnormality."

---

10. We have not overlooked the Court of Appeals' suggestion that " '(T)he scope of matters open for review' in the instant habeas corpus proceeding is limited by appellant to the issue of his competency to stand trial before his court-martial." (page 98 of 326 F.2d). In granting petitioner leave to state all possible grounds in an amended petition we were perhaps committed to a not dissimilar sort of error as that committed by the Court of Appeals in Burns v. Wilson, supra, when it exceeded the scope of permissible review of habeas corpus in a military prisoner case. We granted that leave, however, because we knew of no other way to anticipate the most probable future applications for writs that petitioner will file to which the doctrine of res judicata would not be applicable. Cf. Sanders v. United States, supra. For an illustration of the possibilities of continuous litigation presented by prisoners serving exceedingly long sentences, see Judge Becker's opinion in Smith v. Settle, W.D.Mo.1962, 212 F. Supp. 622, at 623.

The recommended jump to the medical and legal conclusion that petitioner was *therefore* incompetent to stand trial is then suggested by urging the application of the principle that the "Constitutional guarantee of a fair trial is an essential basis of democracy intended to protect all people but surely it is more particularly intended to protect those who are unable to protect themselves" to the assumed factual situation of this case.

There, of course, can be no quarrel with the legal proposition stated; the difficulty arises from the attempted application of its inherent absolute concept that all persons who may quite correctly be diagnosed as mentally ill must *therefore* be considered as persons who cannot stand trial. Such a proposition cannot be maintained from either a legal or a medical viewpoint.

Who would hesitate, for example, to put to trial one charged with "kleptomanic-like stealing," (to borrow a phrase from Dr. Menninger's book, The Vital Balance, page 208), if it was apparent to competent medical experts and to everyone in the court room that the particular defendant understood the nature of the proceedings against him and could properly assist his defense counsel?

Any apparent medical and legal confusion that may be reflected in some of the cases is reduced and most real differences of conflicting judgments are eliminated if both disciplines recognize that both medicine and the law treat and deal with questions of mental illness as measurements of difficult grey questions of relative degree rather than the easy selection of absolute alternatives of black or white.[11]

■ The precise focus of our required search and review of the record therefore is not to determine whether petitioner was suffering from a mental illness at the time of trial; or, even more specifically, whether the diagnosis of schizophrenic reaction, n. e. c. [not elsewhere classified] made by Dr. Alfred B. Lewis, petitioner's principal defense medical witness, was or was not a correct medical diagnosis. As we have suggested, the medical and legal criteria for determining competency at the time of trial is entirely different from that to be applied in a determination of whether a particular defendant should be held criminally responsible for the commission of the alleged offense in light of his then existing mental condition.

When we stated earlier in connection with this case (Footnote 1 on page 918 of 211 F.Supp.) that "[e]stablishment of sanity at either time [i. e., either at the *time of the offense* or at the *time of trial*] does not establish sanity for the other", we had in mind and were making direct—but perhaps too brief— reference to the rules of decision established in this District Court as a result of its frequent treatment of cases arising out of Springfield Medical Center. The judges of this Court have long recognized that a medical diagnosis of mental illness does not conclusively establish that a defendant is not incompetent to stand trial.

The leading case in this district, Higgins v. McGrath, W.D.Mo.1951, 98 F. Supp. 670, was written fourteen years ago by Judge Ridge. In that case the defendant was diagnosed as schizophrenic reaction, paranoid type. The reports from the Medical Center are set forth fully in that opinion. Those medical reports show that in those then early days in the administration of Sections 4244–4246 of Title 18 United States Code, the doctors were under the misapprehension that because defendant's "mental condition is such that he is not criminally responsible for his behavior" and that because "this man remains psychotic and mentally incompetent" that it necessarily followed that "[h]e does

---

11. We commented in greater detail on the problem of confusion and the regrettable lack of communication between the disciplines of law and medicine in what we had to say at the Institute on Sentencing for Federal Judges at Denver, Colorado, in February, 1964. See 35 F.R.D. 459, at page 464.

not know right from wrong *nor can he defend himself or accept the advice of counsel*" (page 675 of 98 F.Supp., emphasis ours).

Judge Ridge held in Higgins that:

"In criminal procedure, the question as to whether one is so insane that he cannot stand trial for a criminal offense is distinct from the question and issue to be determined as to the mental capacity of an accused, as affecting his guilt. * * * A verdict or finding as to an accused's sanity and mental capacity to stand trial is conclusive only of his mental state at that time. Such a verdict and finding is not conclusive of the mental competency of the accused at the time of the commission of the offense."

Higgins recognized that this Court, merely because the Medical Center is within its geographical jurisdiction, could not determine with finality in a habeas corpus proceeding the question of whether one committed by another District Court under Section 4246 of Title 18 United States Code, was competent to stand trial in that other District Court. Higgins established, however, that " * * * if *despite the judgment of the hospital staff that petitioner has not recovered, or that he does not possess mental capacity to stand trial for an offense,* there is substantial doubt on that question from a consideration of criminal legal standards, it becomes the duty of this court to see that a new determination of the petitioner's sanity is made, and, for that purpose, a writ of habeas corpus may be granted, commanding the return of petitioner before his committing court" (page 674–675 of 98 F.Supp., emphasis ours).

The testimony at the hearing in Higgins illustrates vividly the reason why a medical judgment of mental illness does not control the determination of the essentially legal question of competency to stand trial; and why, not infrequently, a judicial determination of competency to stand trial may be in apparent conflict with the expression of a medical opinion that the defendant is mentally ill.[12] The hearing in Higgins revealed that it was "Dr. Glotfelty's conclusion * * * that from a strict medical viewpoint petitioner is insane, does not know right from wrong, and, *as a consequence thereof,* petitioner cannot defend himself of the charge made against him." Of course, it simply does not follow that because a particular defendant is insane that he can not stand trial. If that were true, an insane defendant would never be given an opportunity to present a defense of insanity.

The hearing in Higgins established that there was reasonable cause to believe that the defendant was in fact competent to stand trial; and that, indeed, an indefinite continuation of custody without a hearing on the very question of his competency to stand trial by and in the committing court would present obvious due process questions (see page 673 of 98 F.Supp.). In spite of Dr. Glotfelty's expressed conclusion that the defendant was not competent to stand trial, Judge Ridge noted that "Dr. Glotfelty testified in the instant proceeding, that at the present time petitioner is completely oriented for time, place and persons."

Judge Ridge, after an analysis of all the facts and circumstances in evidence, noted that "petitioner's testimony re-

12. Our experience with numerous cases in this general field of developing law has convinced us, at least tentatively, that the conflict in legal determinations and medical opinion is much more apparent than real. When members of the legal profession and members of the medical profession understand and keep in mind what each are really asking the other; and when both focus specific attention and make separate inquiry on the two entirely separate and basically different questions presented by judicial inquiry into competency to stand trial, as distinguished from responsibility at the time of the offense, differences in legal judgment and medical opinion are infrequent.

veal that he apparently has full knowledge and memory of the circumstances relating to the commission of the offense with which he is charged" and that "he is capable of advising with counsel concerning any defense to be made to the charges now pending against him" (page 677 of 98 F.Supp.). In summary, Judge Ridge held:

"Petitioner's testimony, taken as a whole, and his appearance before the court, reveal that he is fully oriented as to the instant proceedings, and as to the nature and cause of his present confinement. That he presently has a realization that the acts with which he is charged by indictment are in violation of law; that for such violations he may be subjected to punishment; and that before being so punished, if he is punished, he has the right to a trial on the merits thereof, at which his sanity may be placed in issue, is the only conclusion that can be reached from his testimony."

The defendant in that case was accordingly ordered returned to his committing court for a competency hearing. In so doing, Judge Ridge made clear that the mere fact that the defendant was suffering from a degree of mental illness would not prevent his trial. In that connection it was held:

"Whether the insane delusions of petitioner enter into the commission of the crime with which he is charged, is a matter for determination by the trier of the facts on the issue affecting petitioner's guilt. If such fact exists, petitioner is entitled to have that matter determined. Standing alone, it should not, in our opinion, under the present evidence, prevent petitioner's trial on charges now pending against him."

In Wieter v. Settle, W.D.Mo.1961, 193 F.Supp. 318, Judge Ridge dealt with another defendant diagnosed as a schizophrenic reaction, paranoid type. Habeas corpus issued. Wieter suggested criteria that doctors should apply to keep them from jumping to the untenable conclusion that a particular defendant is. not competent to stand trial merely because he is in fact mentally ill, or because the doctors were of the firm medical opinion that, because of his mental condition at the time of the offense, he should not be held legally responsible for his alleged criminal action.

Judge Ridge noted that the Wieter case was a "classic example" of the type of habeas corpus cases reviewed by this Court involving Section 4244–4246 commitment to the Medical Center by other District Courts throughout the United States. He commented that:

"In many such cases this Court is confronted with a conclusion of the Neuropsychiatric Staff of the Medical Center, that the petitioner, considered from psychiatric discipline, is unable to rationally understand the nature of the criminal proceedings pending against him and is unable to rationally cooperate with his counsel in defense thereto. However, when some such persons personally appear before this District Court in a habeas corpus proceeding it is evident from legal concepts that they, in all probability, are possessed of mental faculties that would sanction their right to stand trial on the charge made against them; and that this Court, in failing to recognize and so adjudicate that fact, would be on the threshold of cooperatively denying some such persons the right to a 'speedy' trial as commanded by the Sixth Amendment to the Constitution of the United States."

In Wieter, Judge Ridge emphasized that the judicial inquiry into the question of whether the defendant should stand trial was *not* an inquiry into whether the defendant was "capable, or incapable, of knowing right from wrong; or as being 'mentally ill' or afflicted with 'mental disease' " (page 322 of 193 F. Supp.).

As in Higgins, the medical evidence on the particular question of whether the

defendant was competent to stand trial was clear in that "petitioner was well oriented in the three spheres, of places, persons and things; without perceptible abnormalities of hallucinations or delusions; seemingly, with intelligence in the average range, although he appeared to be confused in his thought processes, with a tendency to lose emotional control when talking about his present and past offenses and his hospitalization, and retreated into autistic hyper-religious ideation * * *". Judge Ridge added that "[b]y his testimony, in chief, and under examination by this Court, he [the defendant] elicited knowledge of the facts that led up to his arrest." It was obvious from other evidence that the defendant had been able to assist his counsel.

The medical diagnosis was "[s]chizophrenic reaction, paranoid type, in partial and tenuous remission, manifested by hyper-religiosity, decreased self-control, life history of social and occupational instability, excessive dependency on institutional living, excessive suspiciousness, and grandiose and persecutory ideas."

Because of that diagnosis, a matter not really in dispute, the psychiatrist jumped to the unwarranted conclusion that "petitioner is at the present time unable to rationally understand the proceedings against him, and is unable to rationally cooperate with his counsel in his own defense."

Judge Ridge refused to accept that conclusion. He did so with an expression of lack of intention of disparagement of medical opinion; but he made clear the nature of the factual data upon which judicial judgment must be based in determining the particular question of competency to stand trial. He stated that:

"When it is evidentially made to appear in a habeas corpus proceeding by a person under arrest status, confined pursuant to Sections 4244–4246, Title 18, U.S.C.A.: (1) that he has mental capacity to appreciate his presence in relation to time, place and things; (2) that his elementary mental processes are such that he apprehends (i. e., seizes and grasps with what mind he has) that he is in a Court of Justice, charged with a criminal offense; (3) that there is a Judge on the Bench; (4) a Prosecutor present who will try to convict him of a criminal charge; (5) that he has a lawyer (self-employed or Court-appointed) who will undertake to defend him against that charge; (6) that he will be expected to tell his lawyer the circumstances, to the best of his mental ability, (whether colored or not by mental aberration) the facts surrounding him at the time and place where the law violation is alleged to have been committed; (7) that there is, or will be, a jury present to pass upon evidence adduced as to his guilt or innocence of such charge; and (8) he has memory sufficient to relate those things in his own personal manner: —such a person, from a consideration of legal standards, should be considered mentally competent to stand trial under criminal procedure, lawfully enacted."

Our brother Judge Becker applied the rules of decision announced in Higgins and Wieter in Pavlick v. Harris, W.D. Mo.1963, 222 F.Supp. 79. In both cases habeas corpus issued to send a defendant back to his committing court for hearing on his competency to stand trial in the face of medical diagnosis of a dangerous mental illness.

And in United States v. Sermon, supra, we refused, on the facts there involved, to accept the medical conclusion of incompetency to stand trial because of an alleged inability of a particular defendant to assist in his own defense.

In Sermon we noted that defendant's argument that:

"The real thrust of defendant's argument is that any diagnosis and evaluation of any degree of mental illness is conclusive evidence that a defendant is not competent to stand trial."

The real thrust of petitioner's argument in this case is essentially the same

as the argument made in Sermon. In this case, petitioner would have us accept a diagnosis of mental illness (obviously rejected by the court-martial) to sustain petitioner's claim that he was not competent to stand trial. In rejecting the essentially similar argument presented in Sermon, we said:

"Slough and Wilson, in their article 'Mental Capacity to Stand Trial,' 21 U. of Pitts.L.Rev. 593, 595 (1960), posed and answered the question as follows:

"'Is mental illness *per se* sufficient to preclude an immediate trial? Recognizing that implicit in any generalization is the possibility of inaccuracy, we answer that a diagnosis of mental illness, standing alone, is not, under any accepted standard, tantamount to mental incapacity to stand trial.'"

We add what we also stated in that case:

"Of course, the problem in this case, as in all close cases, is how does one determine whether a particular defendant is sufficiently mentally competent properly to assist in his own defense? Does this particular defendant, in the language of Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), in fact have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding?' Does this particular defendant, again in the language of the same case, have 'a rational as well as factual understanding of the proceedings against him?'"

And, on the question of how much weight must be given a medical diagnosis, we held:

"The single fact that the panel of outstanding and respected experts concur in a medical diagnosis * * [of mental illness] does not controllingly answer those and similar questions. Our acceptence of that particular diagnosis does not command an agreement with the ultimate statutory opinion of the doctors in their report expressed in the language required by Section 4244 [that the defendant was not competent to stand trial]."

Consistent with the teaching of Higgins, Wieter and the Pavlick cases, we held in Sermon that:

"Defendants do not assist in their own defense by telling their lawyers what motions to file or how a particular witness should be examined, or cross-examined. As suggested in Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725 at 729–730, cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067, '"[t]o assist in his defense" of course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc.' We think it must also be added that the primary assistance that must be rendered counsel is a full revelation of the facts within the knowledge of the defendant in areas which are in legitimate dispute. * * * Specific and particular inquiry must be focused on what the facts show that defendant has remembered and what he has communicated to his counsel."

█ In making our required review of the evidence in this case, we shall make the same sort of specific and particular review of all the evidence that was considered by the military authorities and all of the additional evidence gathered by the parties after the remand of this case to this Court for further proceedings. We turn now to that task.

### Required Review of Medical Evidence Concerning Pretrial Investigation And That Adduced at Court-Martial

It must be noted at the outset of the required review of the evidence that petitioner's mental condition was a matter of concern to the military from the very beginning of the prosecution. The offenses were committed July 12, 1958. The Investigator's Report was filed .

July 23, 1958. An affirmative answer was checked on the form of that report in response to the printed question: "9a. There were reasonable grounds for inquiring into the mental responsibility of the accused at the time of the offense." (Exhibit D–1, page 123).

Under 9c. of that report, asking "if grounds for inquiry as to the accused mental condition exists, state reasons therefor and any action taken," Lt. Synold, the Investigating Officer, stated:

"At the time of the investigation the accused was confined in Ward #57, US Army Hospital, Ft. Jackson. Due to the nature of the offenses and actions of the accused, there is some doubt as to his mental condition. The accused is pending psychiatric evaluation the results of which are unknown to the investigating officer. However, during the investigation, in my opinion, the accused appeared to possess sufficient mental responsibility to distinguish right from wrong and to adhere to the right." (Exhibit D–1, page 123).

Question 9b. posed the precise question petitioner seeks principally to review in this case. The question stated: "There were reasonable grounds for inquiring into the mental capacity of the accused at the time of the investigation." That question was answered in the negative (Exhibit D–1, page 123).

The military law, in a manner completely consistent with the civil cases we have discussed above, carefully separates the question of responsibility for the offense from the question of competency at the time of trial. Questions 9a., 9b., and 9c. in the form to which reference has just been made make specific reference to particular and important paragraphs in the Manual for Courts-Martial.

Question 9a.—inquiring in regard to responsibility at the time of the offense —refers to "(MCM 120b)". Paragraph 120b of the Manual provides:

"A person is not mentally responsible in a criminal sense for an offense unless he was, at the time, so far free from mental defect, disease, or derangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right."

Question 9b.—inquiring as to competency for trial—refers to "(MCM 120c)". That paragraph of the Manual provides:

"No person should be brought to trial unless he possesses sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense."

Paragraph 121 of the Manual makes reference to both of the paragraphs just quoted. It establishes the tests applicable to each in the following language:

"a. Was the accused at the time of the alleged offense so far free from mental defect, disease, or derangement as to be able concerning the particular acts charged to distinguish right from wrong (120b)?

"b. Was the accused at the time of the alleged offense so far free from mental defect, disease, or derangement as to be able concerning the particular acts charged to adhere to the right (120b)?

"c. Does the accused possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense (120c)?"

Absent any evidence to the contrary, and there is none, we cannot assume anything except that the Investigating Officer in fact believed that there was reasonable grounds for inquiring into the mental responsibility of the accused at the time of the alleged offense; and that, by the same token, he did not believe that any reasonable grounds existed for inquiring into the mental capacity of the accused at the time of the investigation.

Pretrial Psychiatric Examination and Court-Martial Testimony of Dr. Lewis, Medical Witness for the Defense

██ Captain Alfred B. Lewis, Jr., of the Medical Corps, later to be petitioner's

principal defense witness on the issue of responsibility at the time of the offense, saw the petitioner shortly after he was placed in Ward #57.[13] His report of July 19, 1958, prepared before the trial of the court-martial, states his diagnosis of petitioner's mental condition as follows:

"Schizophrenic reaction, n. e. c., manifested by extreme tension, pathological hostility toward women, a history of attempting violent acts, either assault or rape, against women since age 9, possible visual and auditory hallucinations, suicide wishes, a boastful attitude about his offenses, marked ambivalence, thinking difficulty, and total lack of insight into the reasons for his behavior. LD, No, EPTS." (Exhibit D-3, page 1).

But that report also reveals that Dr. Lewis had no difficulty in communicating with the petitioner and that his concern in regard to petitioner's mental capacity was focused on his mental condition as of the time of the alleged offense. Under Dr. Lewis' "comments and recommendations" he stated on page 5 of Exhibit D-3 that:

"In view of the diagnosis of schizophrenic reaction, which is a mental disease process, it was recommended that authority be granted for EM's transfer to a neuropsychiatric center for observation, treatment and appearance before a formal Sanity Board, for determination of mental status *at the time of the alleged offenses on 12 July 1958.*" (Emphasis ours.)

In the "mental status examination" portion of his report, Dr. Lewis stated that "Patient is a large, obese, 20 year old white prisoner who appears extremely tense and anxious. He is sweating profusely. His conversation is coherent, relevant and spontaneous. Voice is loud and firm. Patient is very open in talking about his offense." (Exhibit D-3, page 3) and on the next page of his report, that "his orientation and memory are intact."

Dr. Lewis obtained the following detailed history from the petitioner:

"On 12 July 1958, according to the patient's story, he was on pass, in civilian clothes, when he was asked the directions to Company C, 13th Battalion, by the wife of a trainee who was going to visit her husband. He offered to direct the woman to the company and asked to ride along with her. Instead of directing her to the company, however, he directed her to a lonely road on the post. When she became suspicious and started to turn around, he grabbed the wheel from her and threatened her. He made her get out of the car and told her to 'shut up or I'll kill you.' He began to choke her and did so until her fingers turned blue and contracted. He tore her blouse and skirt though he states he had no intention of raping her. He states that he hit her across the face and stamped his foot down across her throat and that she 'gasped like a doomed person.' He then planned to drive the car over her head in order to kill her, but when he turned the car around, he accidentally ran into a ditch. He then picked up her clothes

13. There can be no question but that Dr. Lewis was a qualified medical expert. He was a trained psychiatrist and Chief of the Medical Hygiene Clinic at Fort Jackson. He testified as follows concerning his educational background: "I graduated from the University of Pennsylvania Medical School in 1953. I attended medical internship at the Roosevelt Hospital in New York City, ending in July 1954. I then had three years of psychiatric residency at the Payne Whitney Clinic Division of the New York Hospital in New York City from 1954 to 1957. After I finished my residency I came on active duty and was assigned to this post after six weeks orientation at Fort Sam Houston." (Exhibit D, page 44).

He is at present the Assistant Attending Psychiatrist at Payne Whitney Psychiatric Clinic (Exhibit H).

and tried to conceal her in the brush. He was able to get the car out of the ditch and then left Fort Jackson to drive to Myrtle Beach, South Carolina. His reason for doing this was that he owed a man there $31.00 and he wanted to pay him off. After transacting this business, patient states that he then drove into North Carolina driving at 120 to 130 miles per hour. At that speed, he had a blowout, turned over several times and went off the road. He then states that he paid a young farm boy with a tractor to pull him out and get his car back on the road. However, when found by the State Police, he was found not to have a registration for the car and he was booked by them. When they were about to let him go, he confessed that he had killed a woman, so he was transferred back to Columbia." (Exhibit D–3, page 2).

Petitioner was tried on August 29, 1958. Dr. Lewis testified on petitioner's behalf. That testimony, as is usual, tracked very close to the report the doctor prepared after his pretrial psychiatric examination. In regard to that pretrial examination of petitioner, Dr. Lewis testified at the trial as follows:

"Q. What happened at that examination?

"A. I asked him to tell me what had happened. He described this assault, and in his description of it and during that interview I concluded there was sufficient evidence of psychosis that I felt it advisable to transfer him to the psychiatric ward, from which I planned to transfer him to a Class II hospital, such as Walter Reed or Valley Forge for further

psychiatric examination." (Exhibit D, page 45).[14.]

At the court-martial trial, Dr. Lewis confessed his diagnosis of schizophrenic reaction (Exhibit D, page 45). His testimony reveals that he fully recognized that the disease he diagnosed involved considerations of degree and that he was troubled, as are many psychiatrists, with prosecution counsel's insistence that he state his medical opinion in absolute rather than relative terms. When asked on cross-examination, for example, "Is it your diagnosis that this man is insane, Dr. Lewis?", he answered: "I don't think that is a proper question. * * * I think the man in certain circumstances adheres to the right. * * * I think the question is improper."

The answers that Dr. Lewis gave to a series of questions propounded by the Law Officer of the court-martial adequately illustrates Dr. Lewis' view as to why the question posed in terms of absolute sanity or absolute insanity were improper from a medical point of view:

"Q. What you are saying, Doctor, is that ordinarily or a greater part of the time a person with a schizophrenic reaction such as you described to the court is considered perfectly normal and sane most of the time?

"A. I would conceive of this as being a chronic process which the patient is able to conceal most of the time.

"Q. And when he conceals it, he is considered perfectly normal and sane?

"A. * * *

"Q. By the people around him?

"A. Yes." (Exhibit D, page 53).

It was in response to further questions by the Law Officer, and in further development of the testimony just quoted,

14. No significance should be attached to the failure of Dr. Lewis to add, as he did add in his report, that the purpose of the recommended evaluation was "for determination of mental status *at the time of the alleged offenses* on 12 July 1958." (See Exhibit D–3, page 5). As will be later developed in detail, no concern was expressed at any time by anyone, including Dr. Lewis, about petitioner's competency to stand trial.

that an apparent and almost accidental, but not a real, inquiry was made in regard to petitioner's mental condition at the time of trial. The first series of those questions are as follows:

"Q. What I'm getting at, Captain, is, can you give us an opinion as to the mental status of the accused at the present time?

"A. The mental status concerning what in particular?

"Q. In your opinion—what is your opinion as to his sanity or insanity at the present time? Do you have an opinion?

"A. I have an opinion, and my opinion is that he is insane at the present time.

"Q. My question is: In your opinion, at the present time, is the accused so far free from mental defect, disease, and derangement, to be able to distinguish right from wrong and to adhere to the right?

"A. In my opinion, at the present time, he is not able to adhere to the right.

"Q. And your opinion is that he was not able to adhere to the right on 12 July?

"A. That is right." (Exhibit D, page 54).

And those questions and answers were immediately followed by further questions and answers in which Dr. Lewis readily conceded to the Law Officer that it was his (Dr. Lewis') opinion that petitioner was in control for much of the time since the time of the offense, although Dr. Lewis was convinced that his diagnosis was correct and that he would not have wanted petitioner out of custody.

Those questions and answers are as follows:

"Q. In your opinion, between now and July, has there been any time that he had the ability to adhere to the right?

"A. In my opinion, he had the ability to adhere to the right during the interium [sic]. All that I can say, I would be very uncomfortable with him wandering around loose.

"Q. Getting back to my question, this condition is it not a potential rather than a real abnormality? What I mean by that, is not his conduct usually normal and there is a potential there for abnormal conduct?

"A. Yes, I think that expresses it very well.

"Q. And to a certain extent there is some of that in all people, isn't there, Captain Lewis?

"A. Sir, that is a very difficult question to answer and my first impulse is to say, I hope not. We are all open to impulses, and I think a very philosophical question as to whether it exists in everyone as to any degree is a relative matter.

"Q. Doctor, isn't this entire matter a relative matter?

"A. I would say so." (Exhibit D, page 54).

Court-Martial Testimony of Dr. Mathews, Medical Witness for the Prosecution

The prosecution called Dr. Robert Samuel Mathews.[15] Dr. Mathews' opinion was that petitioner should be diagnosed

15. Dr. Mathews, like Dr. Lewis, was a well qualified witness. He was the Chief of the Mental Hygiene Clinic of the Veterans Administration Regional Office of the State of South Carolina. In regard to his educational background he testified: "I graduated premedical training, A.B., University of North Carolina; M.D. from Medical College of South Carolina, and graduate training in Neurology and Psychiatry at Boston City Hospital. * * * I am a Diplomate * * * certified by the Board of American Neurologists and Psychiatrists." (Exhibit D, page 72).

He has practiced twenty-two years and holds the rank of Colonel in the Medical Corps Reserve of the Army.

as a "sociopathic personality, and anti-social personality" and that such a condition was a personality disorder and not a mental disease. Dr. Mathews testified that, in his opinion, petitioner had the ability at the time of the offense to adhere to the right (Exhibit D, page 73).

Counsel for the prosecution asked Dr. Mathews a series of questions in which inquiry concerning responsibility at the time of the offense was somewhat intermingled with inquiry that could be said to have related to petitioner's competency to stand trial. In order that the full picture be stated, we quote the entire line of questions and answers. They read as follows:

"Q. As a result of your examination of the accused, do you have an opinion at the present time as to the accused's ability to understand the nature of the charges against him and to cooperate in his defense?

"A. I have made a diagnostic evaluation based on my interview and corroborative data, et cetera.

"Q. Would you state what your opinion is, sir?

"A. My opinion is that he is a case of what we call 'sociopathic personality, and antisocial personality.' In the past we have designated this 'Constitutional psychopathic state;' 'Psychopathic state, pathological personality.'

"Q. In your opinion, does he have any mental disease, defect, or derangement, that would pre-vent him from understanding the nature of the charges against him and cooperating in his defense?

"A. I do not feel that he has a mental disease. He has a disorder, personality disorder.

"Q. In your opinion, does he have the ability to adhere to the right?

"A. In my opinion, he has the ability to adhere to the right." (Exhibit D, pages 72–73).[16]

As he had when Dr. Lewis was on the stand, the Law Officer asked Dr. Mathews a direct question concerning petitioner's competency at the time of trial. That question and its answer were as follows:

"Q. In your opinion, is the accused so far free from mental defect, disease, and derangement, as to be able to intelligently conduct or cooperate in any defense of his case?

"A. I believe he does have the intelligence. I am considering the fact that he had an IQ of 80 to 83, which is designated dull normal. Dull normal intelligence, considering that, and within the bounds of that intelligence endowment, the answer to the question is yes." (Exhibit D, page 75).

Proper Recognition Was Given at the Court-Martial Trial of the Fact That Petitioner's Competency to Stand Trial Was Not an Issue for Determination

Immediately after Dr. Mathews was excused as a witness, the Law Officer be-

---

16. Dr. Mathews was also asked upon what data did he base his examination. He answered "my diagnosis is based upon my personal examination of the accused, on the study of the copies of the records of the investigation, including the certificate of Captain Lewis, the Hospital Psychiatrist here at Fort Jackson; also on photostat copies of records from the United States Navy and the records from the West Virginia State Hospital in Huntington, West Virginia. Also, there is another diagnosis made by another psychiatric clinic, and I believe it was in those records; I don't recall just where, but I believe it was in a psychiatric clinic in Cleveland. I studied that material along with the data of my examination. I also had a fifteen minute talk with Captain Teft concerning his behavior. I have discussed the case with yourself; that makes the essential data. That summarizes the essential data on which my diagnosis is based." (Exhibit D, page 73).

gan his discussion with counsel for both sides in regard to what instructions should be given. Our consideration of what was said during that discussion must be in light of a record that makes clear that neither counsel for the prosecution nor for the defense had ever initiated any examination of any witness on the subject of the competency of the petitioner to stand trial.

The following colloquy concerning the instructions to be given shows that the Law Officer, the only person who had made any inquiry on the subject of trial competency, quite properly wanted to make certain that the record correctly reflected that petitioner's competency to stand trial had not been put in issue and that there was therefore no necessity for any instruction on that subject. The following is a full quotation of what took place:

"LAW OFFICER: Now, as to the instructions on insanity, I intend to instruct on mental responsibility. The question arises now as to mental capacity. Is the accused's mental capacity at this time in issue?

"DEFENSE: You mean so that he can participate in his own defense?

"LAW OFFICER: Yes.

"DEFENSE: The defense is not making that an issue, sir.

"PROSECUTION: Sir, I feel that it was raised by some of the defense witnesses, that the man was and is insane, which was in the issue of sanity.

"LAW OFFICER: I'm afraid that some of the psychiatric testimony got into that question as to the accused's sanity at the present time, which would raise the question of mental capacity. However, since the defense is not raising that point and no motion has been made, it shouldn't be necessary to instruct on that." (Exhibit D, page 76–77).

Specific and pointed opportunity to put petitioner's competency to stand trial was thus obviously afforded petitioner at that point in the court-martial trial.

Except for the direction given us by our Court of Appeals, we believe that Whelchel v. McDonald, supra, would be a complete answer to petitioner's present claim concerning any possible issue of trial competency that could be raised in any habeas corpus proceeding.

 But even if Whelchel is not as controlling as we, but not the Court of Appeals, believed, it is clear that the colloquy just quoted and the action taken by the Law Officer at the court-martial that was predicated on that colloquy did not deprive petitioner of any constitutional right. Once again, it must be recognized that the burden both of raising and sustaining the defense of present insanity rests upon an accused. (See our full discussion of those questions in Sermon at page 982 of 228 F.Supp.) An alleged failure of defense counsel or a Law Officer of a court-martial to inject a defense for which there was no factual support can not be said to be a denial of due process.

When the colloquy between the Law Officer and counsel for both sides is viewed in the light of all the facts and circumstances of this case it is quite apparent that the Law Officer was doing no more than any careful trial judge would have done in obtaining an expression for the record from both sides as to whether either side wanted an instruction on an issue which the Law Officer felt that he might have injected into the case by questions that he had asked the medical witnesses.

The slight testimony elicited in response to the Law Officer's questions concerning petitioner's trial competency has been fully set forth above. Nothing in that testimony nor anything else that happened in connection with the trial of the court-martial carried with it the remotest suggestion that petitioner did not, in fact, in the language of paragraph 120c of the Manual for Court-Martials, fully possess "sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense." We so find and determine.

In making that finding and determination we have taken into account the express duty placed on the Law Officer by paragraph 122b of the Manual for Court Martials. The pertinent portion of that paragraph provides that "the issue of insanity may be raised at any time while a case is before the court." That paragraph further states that "the actions and demeanor of the accused as observed by the court or the bare assertion from a reliable source that the accused is believed to lack mental capacity or is mentally irresponsible may be sufficient to warrant inquiry." And finally, that paragraph provides that "a request, suggestion, or motion that inquiry be had may be made by any member of the court, prosecution or defense."

In light of paragraph 122b and in light of all the facts and circumstances we have outlined above, we find that it is most probable that the Law Officer from his observation of the actions and demeanor of the petitioner, was not inclined, on his own motion, to put in issue petitioner's mental competency to stand trial. We also find that he would certainly have given an instruction on that subject if a request had been made by the defense; else he would not have said what he did say.

Our general appraisal of the conduct of the Law Officer in the court-martial, as reflected by the entire court-martial record, was that he was fair, careful and impartial. We can not help but believe that if he had noticed anything in the actions or demeanor of the petitioner during the trial that would have in any way suggested to him that the petitioner did not in fact understand the nature of the proceedings or that the petitioner was not in fact able to cooperate in his defense that he would not have hesitated to move on his own motion to order an inquiry into that phase of petitioner's mental condition. We so find.

 Apart from the proposition that familiar presumptions probably would require the findings we have made concerning the colloquy between the Law Officer and counsel for both sides, we are again faced with a total absence of any evidence adduced by petitioner in connection with that minor trial incident, or in any other connection, that the Law Officer acted unfairly or that he did not fully consider the immediate problem before him. Petitioner, once again, simply fails even to attempt to carry the burden of proof in this habeas corpus proceeding.

Required Review of the Procedures and the Evidence Concerning the Regular Military Review of Petitioner's Court-Martial Conviction

In accordance with regular military procedure a Review of the Staff Judge Advocate was presented to the Commanding General of Fort Jackson on October 7, 1958. That Review, prepared by Lt. Col. Henry W. Witcover, presented a careful and accurate summary of all the evidence adduced and all proceedings taken at the court-martial. That Review correctly stated that "the defense in this case predicated his whole attack on the accused's ability to adhere to the right" (Exhibit D–2, page 121). We think the summary of Dr. Lewis' testimony in which language we noted above in which the question of petitioner's trial competency was commingled with a question regarding responsibility at the time of the offense was a fair and accurate summary. In that connection, the Review states:

"Asked by the law officer as to his opinion as to the sanity or insanity of the accused, Captain Lewis felt he was insane at the present time, it being his opinion that 'he is not able to adhere to the right' (R 50), nor was he able to adhere to the right on 12 July 1958 (R 50)." (Exhibit D–2, page 122).

Under the "discussion" section of the Review it was accurately, carefully, and fairly stated that:

"The defense raised the question of the accused's ability to adhere to the right at the time these crimes were committed. It should be noted that the defense asserted that the question of mental capacity at the time of trial was not in issue (R 72).

The defense sought to establish that, although the accused had the ability to tell right from wrong, he did not have the ability to adhere to the right." (Exhibit D–2, page 124).

The "civilian background" section and the "military background" sections of the Review, obtained for future clemency consideration, were obtained from petitioner shortly after the court-martial at a personal interview at which petitioner's defense counsel was present. Those sections, which need not be summarized, are detailed and accurate. Under the section requiring the Staff Judge Advocate to state his "personal impressions" the following statement appears:

"I found the accused to be a well oriented, completely rational individual, somewhat on the obese side (two hundred sixty-five pounds), quite tall (six feet four inches), somewhat myopic. His thought processes are unusually slow, but it is equally evident that once he has gained an idea it remains steadfast in his mind. His memory is intact, and he is coherent. He analyzes problems in a somewhat slow and dull but responsive manner. He is completely logical in the analysis and outcome of the problem. He displayed traits of humor. He has a thorough awareness of the situation, discussed the course of the trial as well as the acts of which he was accused in a thorough and comprehensive manner. He recites without hesitation the acts which occurred on that particular day, remembering in detail all the matters which transpired. He discusses thoroughly the trial in which he was a participant and has fixed opinions of the various principals in that trial." (Exhibit D–2, page 128).

The concluding comment of Lt. Col. Witcover as to his personal impression of the petitioner shortly after the court-martial was that:

"The accused responded normally to his predicament, to his trial, and to the results of the trial. *He averred complete satisfaction with his defense counsel and the conduct of the trial.* He showed normal dislike for the trial counsel but said he recognized that he had the duty to perform, and he finally asserted that he was not guilty because he was insane. Although he stated that he had done the acts charged, he contended that he should be released as thirty years' confinement is a long time. I see nothing abnormal in this reaction." (Exhibit D–2, page 128, emphasis ours).

We find that the Review of the Staff Judge Advocate was full and fair and determine that petitioner's Constitutional rights were in no way violated. There is no evidence to the contrary.

Required Review of Medical Board Proceedings and Other Military Psychiatric Examinations

On November 25, 1958, the Judge Advocate General requested that the United States Disciplinary Barracks at Fort Leavenworth conduct Medical Board Proceedings for Psychiatric Examination of the petitioner (Exhibit C, pages 3–5).[17] That request stated in part the following:

"1. Pursuant to paragraphs 121 and 124 *Manual for Courts-Martial, United States, 1951,* it is desired that

---

17. That request was made pursuant to Paragraph 124 of the Manual for Court-Martials which states: "After consideration of the record as a whole, if it appears to the convening authority or higher authority that a reasonable doubt exists as to the sanity of the accused, he should disapprove any findings of guilty of the charges and specifications affected by such doubt and take appropriate action with respect to the sentence * * *. [A]ction * * * [is to be taken] whenever it appears from the record of trial or otherwise that further inquiry as to the mental condition of the accused is warranted in the interest of justice, regardless of whether any such question was raised at the trial or how it was determined if raised."

Paragraph 121, of the Manual, mentioned in the quotation from the Request that will immediately follow, has already been fully quoted in this opinion.

a board of medical officers be convened to inquire into and render conclusion and opinion on the mental condition of the accused, Private First Class (E–3) Thomas T. Swisher, in respect to the following issues:

"(1) Did the accused on 29 August 1958 (the date of his trial) possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently conduct or cooperate in his own defense?

"(2) Did the accused on 26 September (the date of the convening authority's action) possess sufficient mental capacity to understand the nature of the proceedings against him and to intelligently conduct or cooperate in his own defense?

"(3) Does the accused at the present time possess sufficient mental capacity to understand the nature of the proceedings against him and to intelligently conduct or cooperate in his own defense?" (Exhibit C, page 5).

A report of the Medical Board Proceedings for Psychiatric Examination was made to the Judge Advocate General on December 23, 1958. All of the thirteen separate interrogatories were answered. In regard to the first three just quoted, all of which related generally to petitioner's trial competency the following answers were given:

"(1) The accused did, on 29 August 1958 (the date of his trial) possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently conduct and cooperate in his own defense.

"(2) The accused did, on 26 September 1958 (the date of the convening authority's action) possess sufficient mental capacity to understand the nature of the proceedings against him and to intelligently conduct and cooperate in his own defense.

"(3) The accused does at the present time possess sufficient mental

capacity to understand the nature of the proceedings against him and to intelligently conduct or cooperate in his own defense." (Exhibit C, pages 6 and 7).

Those conclusions of the Medical Board, composed of Lt. Col. William J. Tiffany, Capt. George H. Sweeney, and Capt. William Malamud, all of the Medical Corps, and all of whom were psychiatrists, represented not only their own conclusions reached on the basis of their examination of the petitioner a relatively short period of time after the court-martial, they also incorporated and were based upon psychiatric examinations made by still other psychiatrists at New Cumberland Army Hospital on October 17, 1958, and at Valley Forge Army Hospital on October 25, 1958, where petitioner had been held in custody before he was committed to Fort Leavenworth Disciplinary Barracks.

Lt. Col. George Zalkan of the Medical Corps at New Cumberland examined petitioner on October 17, 1958, and reported his findings and recommendations as follows:

"MENTAL STATUS: At the time of the interview Swisher was a rather massive somewhat obese white male who is alert, oriented in all spheres and without gross memory or intellectual deficit. * * * Swisher appears to be in relatively good contact, but is probably somewhat antistical [sic] pre-occupied.

\* \* \* \* \* \*

"DISPOSITION: Transfer to Valley Forge Hospital for evaluation and disposition." (Exhibit C, page 14).

After petitioner's transfer to Valley Forge Hospital, a full Medical Board, all members of which were psychiatrists, was convened at that hospital. It was composed of Lt. Col. Stewart I. Baker, Major Walter S. Mizell, and Capt. Robert B. Carbeck, all of the Medical Corps.

The report of that Board's psychiatric examination, dated October 25, 1958,

shows that petitioner related to those doctors that:

"In July 1958 he offered to drive with a woman, in her car, on the post at Ft. Jackson, to guide her to her destination. He states, however, that he guided her to an isolated part of the post, following which she became panicky and began to scream. Following this he forced her out of the car and tore part of her clothing off. He states he then beat her and strangled her and believing her dead left her for a few moments. Upon returning he found that she was not dead and strangled her again, this time feeling sure he had killed her. He then hid her body in some bushes and covered her with leaves and drove off in her car. The woman was found a short time later and taken to the hospital where she apparently recovered. He was apprehended a short time later, after wrecking the car and returned to Ft. Jackson." (Exhibit D–3, page 19–20).

The report of the Valley Forge Medical Board Proceedings described petitioner's "course in the hospital" and his "general appearance" as follows:

"COURSE IN THE HOSPITAL: On admission the patient, was on the whole, cooperative and oriented as to time, place and persons. He showed an apparent defect in his memory, both recent and remote, but this apparent defect would change throughout the interview. The patient seem[s] to have somewhat below normal intelligence. Initially the patient appeared preoccupied and with a constricted affect and at times would smile inappropriately and posture bizarrely. However, as the interview progressed and comparatively neutral subjects were discussed, his affect became normal, he sat back in a relaxed fashion and answered in a rational, coherent and spontaneous fashion. The only pathology which was consistent was a slight degree of frandiosity.

"In talking about his various antisocial acts he had committed recently, he would state that neither he or anybody would do such a thing on purpose and it seemed to this examiner that the patient was constantly trying to disown any guilt for his actions.

* * * * * *

"On subsequent interviews the patient continued in his attempts to impress the examiner with his attempts to appear psychotic. However, the patient at no time showed any evidence of a thinking disorder such as loosening of associations, concreteness or delusions." (Exhibit D–3, page 21)

A full battery of psychological tests were given petitioner at Valley Forge Hospital to supplement his psychiatric examination. The "observation" section and the "analysis of psychological data" sections of that portion of the Valley Forge Medical Board Proceedings Report, dated October 24, 1958, states that:

"OBSERVATIONS: This patient responded well to test requirements in that he cooperated with the technician. At times it was necessary to be somewhat firm but in the overall it appears he put forth good effort.

* * * * * *

"ANALYSIS OF PSYCHOLOGICAL DATA: This patient functions at a high borderline level at this time but the overall scatter is so broad as to indicate this to be far below optimal levels of efficiency. His range extends from 2 on picture completion to 10 on object assembly with considerable variance noted in between. Qualitatively his performance would be compatible with the records of psychopathic personalities in that picture elements and object assembly are his highest single scores and there is an accompanying 'breeziness' in the way certain items were handled. His Bender performance reveals no evidence of gross pathology since contact with reality,

appreciation of the Gestalten, is observed. There is, however, some classical 'malingering' characteristics noted." (Exhibit D–3, page 29)

The detailed reports of the classification psychiatric examination at Fort Leavenworth are set forth in the record in Exhibit D–3 under Tab F. That report is quite similar in its nature and its observations as the psychiatric reports that we have quoted from New Cumberland and Valley Forge Hospitals.

We find and determine that the report of the Fort Leavenworth Medical Board which answered the specific questions posed it by the Judge Advocate General, based as it was on its own examination at Fort Leavenworth and on the examinations made at New Cumberland and at Valley Forge was fully supported by the evidence in this record. We further find that all of the psychiatric examinations and the reports of the two separate Medical Board proceedings were full and fair and nothing concerning them can be said to have violated petitioner's Constitutional rights. There is no evidence to the contrary; petitioner has failed to attempt to carry the burden of proof in connection with this phase of this case.

Required Review of Trial Conduct of Defense Counsel in Connection with "Possible Issue" the Court of Appeals Concluded Might Exist in Regard to Petitioner's Trial Competency

We now review the military proceedings to determine whether petitioner was denied a fair trial or any constitutional right because his defense counsel, both trial and appellate, concluded there was in fact no issue that could legitimately be raised, and therefore there was no issue for adjudication in connection with petitioner's competency to stand trial.

The plain fact of the matter is that none of the lawyers who represented petitioner at his court martial trial and during the appellate military proceedings ever evidenced any idea that petitioner was not fully competent to stand trial. At no place in either the trial or appellate record of the military proceedings did any of petitioner's counsel attempt to raise any issue that petitioner's mental competency to stand trial may not have been constitutionally adjudicated at his court-martial. The military record shows that such a thought was not one that occurred to any of the five lawyers, both appointed and employed, who defended petitioner throughout the military proceedings.[18]

Under all the facts and circumstances outlined above, it cannot be said that such a thought should have occurred to defense counsel. It is obvious that there simply was no possible available evidence to support such a defense. Nor has any evidence supporting a contrary finding been adduced in this habeas corpus proceeding. All petitioner really requests in this proceeding is that we review the same evidence that was fully and fairly considered by the military authorities and reach a conclusion different from that at which they did not unreasonably arrive.

So far as petitioner's defense counsel at the court-martial are concerned, we must recognize that an elementary knowledge of trial tactics would have dictated that an attempt to raise a defense that petitioner was allegedly incompetent to stand trial in the face of the obvious state of the uncontrovertible evidence to the contrary would have greatly prejudiced petitioner's defense of insanity at the time of the offense. Lawyers must deal with facts as they find them; they cannot manufacture defenses out of whole cloth. Efforts in violation of that principle are not only contrary to the part all lawyers play in the administration of justice; such efforts inevitably redound

---

18. At the trial of the court-martial, petitioner was represented by Lt. Warren D. Blair as appointed defense counsel and by Lt. Ariel V. Conlin, as employed individual counsel. On appeal, defendant was represented by Lt. Neil Flanagin and Lt. Col. Ralph Herrod of the Office of the Judge Advocate General, both appointed counsel, and by Russell L. Furbee, Esquire, of the firm of Furbee and Hardesty of Fairmount, West Virginia, employed by petitioner.

to the detriment of the client. We find and determine that defense trial counsel did everything for petitioner at the court-martial in regard to his trial competency that could have been done and that no constitutional right of the petitioner was thereby violated.

### Required Review of Conduct of Appellate Defense Counsel Before the Military Board of Review

On September 2, 1958 petitioner requested, over his own signature, the appointment of appellate defense counsel to represent him before the Military Board of Review (Exhibit D–2, page 182). That appointment was promptly made. On November 17, 1958 defense counsel submitted a request for psychiatric examination of the accused. As is apparent from what is stated above, a second Medical Board was convened by order of the Judge Advocate General at Fort Leavenworth by his order of November 25, 1958 (Exhibit C, page 3). The record shows that on December 29, 1958, defense counsel had just received the report of the Fort Leavenworth psychiatric examination dated December 23, 1958, and that, pursuant to a request filed by defense counsel that day, a further extension of time was granted defense counsel within which to evaluate that data and to prepare assignment of errors (Exhibit D–2, page 108). On January 15, 1959, still a further extension of time was granted petitioner because "Appellate Defense Counsel has found it necessary to make additional inquiry into accused's mental condition" (Exhibit D–2, page 107).

In February, 1959, petitioner employed Mr. Furbee, the civilian counsel who assisted Lt. Flanagin. Still additional time until April 27, 1959 was granted within which petitioner's Assignment of Errors should be filed in order to permit additional investigation "to the background and home life of the accused as relative to his mental condition and to obtain evidence or affidavits bearing on the question" (Exhibit D–2, page 104).

Petitioner's Assignment of Errors was filed with the Board of Review on April 29, 1959. The following alleged errors were assigned: "(I) The evidence is factually insufficient to establish accused's mental responsibility" (Exhibit D–2, page 83); "(II) Assuming, *arguendo*, that the evidence is factually sufficient to establish accused's sanity, it is insufficient to prove beyond reasonable doubt his capacity to entertain the necessary specific intents" (Exhibit D–2, page 87); "(III) The evidence is insufficient to support the findings of guilty of specification 2 of charge II (assault with intent to commit rape)" (Exhibit D–2, page 87); "(IV) The Law Officer erred by failing to instruct sua sponte on a character and behavior disorder as affecting the accused's capacity to form a specific intent" (Exhibit D–2, page 89); "Charge I and specifications 1 and 2 of Charge II are unreasonably multiplicious for sentence purposes" (Exhibit D–2, page 93); "The Law Officer erred in admitting over defense objection, certain inflammatory and irrelevant real evidence" (Exhibit D–2, page 97); and "The approved sentence is inappropriately severe" (Exhibit D–2, page 101).

While lay judgment of the excellence of legal representation is not always accurate, we think the judgment expressed by petitioner's parents in an affidavit, dated October 5, 1963, which they submitted to the Secretary of the Army, is an accurate appraisal of the quality of the professional services rendered by appellate counsel for the defense. On pages 8–9 of that affidavit (Exhibit Q), petitioner's parents, after reciting their employment of Mr. Furbee, then stated:

"Affiants commend the assistance that they received from First Lieutenant Neil Flanagin, Counsel on appeal for subject, in the preparation and representation of the subject before the Board and upon petition for review filed in the United States Court of Military Appeals. *They know he did an excellent job* but with the record in the shape that it was in, he could do no better." (emphasis ours).

Required Review of the Decision of
the Military Board of Review

The Decision of the Board of Review was handed down June 9, 1959 (see pages 55 to 61, inclusive, of Exhibit D–2 for the full decision). That decision reflects credit upon the administration of military justice. The assignment of errors were accurately stated; the facts were fully and fairly summarized; and each of the assignments of error were noticed and determined. In regard to the assignments relating to petitioner's mental condition, the decision stated:

"The first two assignments of error are that the accused was not proved mentally responsible and that his capacity to entertain the requisite specific intents charged was not proved beyond a reasonable doubt. The defense produced an Army psychiatrist and a nurse. The former testified that the accused could not adhere to the right and the nurse stated that it was her opinion that the accused was insane at the time of the offenses. *It was expressly stipulated that there was no issue of insanity at the time of trial.* Opposed to the defense witnesses were five lay witnesses, non-commissioned officers, and a civilian psychiatrist employed by the Veterans Administration. Suffice it so say, we are convinced from all the evidence, including the testimony of those witnesses, that the accused was legally sane at the time he committed the alleged offenses and that he had the capacity to entertain the necessary specific intents. United States v. Storey, 9 USCMA 162, 25 CMR 424; United States v. Schick, 7 USCMA 419, 22 CMR 209; United States v. Kunak, 5 USCMA 346, 17 CMR 346; Holloway v. United States [80 U.S.App. D.C. 3], 148 F.2d 665 (D.C.Cir. 1945) cert. den. 334 U.S. 852 [68 S. Ct. 1507, 92 L.Ed. 1774] (1958); CM 377832, Batchelor, 19 CMR 452, affirmed 7 USCMA 354, 22 CMR 144; CM 398703, Miller, 26 CMR 570."

(Exhibit D–2, pages 57–58, emphasis ours).

We emphasized the sentence—"It was expressly stipulated that there was no issue of insanity at the time of trial"— in order to direct attention to the context in which it was said. It is obvious from the full paragraph that the decision in a clear and careful manner stated in the first sentence of that paragraph the two assignments of error that the Board of Review would discuss; that the testimony of the defense was accurately summarized in the next two sentences; that any possible question of competency at the time was laid to one side in the third sentence; that the fourth sentence was used to establish the conflicting testimony adduced by the prosecution on the issue of responsibility at the time of the offense; and that the final sentence and the citation of the numerous cases was designed to demonstrate that the prosecution's evidence regarding petitioner's responsibility at the time of the offense had been and was to be accepted over that adduced by the defense.

Neither the Board of Review nor the court-martial was faced with the sort of problem we dealt with in United States v. Roe, W.D.Mo.1963, 213 F.Supp. 444. In Roe, the prosecution introduced no medical evidence on the issue of insanity that had been tendered by the introduction of defense medical testimony under that defendant's plea of not guilty.

In Roe, the defendant called Dr. Charles Keith, Assistant Chief of the Psychiatric Service of the Medical Center for Federal Prisoners, as his witness. The jury convicted, and on motion for new trial, which we sustained, we were required to determine "whether the medical evidence introduced by the defendant, and any other evidence from any witness, was sufficient to enable the Government to now say it carried the burden of proving that defendant was sane at the time of the offense" (page 450 of 213 F.Supp.)

In this case, quite unlike the factual situation presented in Roe, both the court-martial and the Board of Review

were faced with sharply conflicting medical testimony. Had Dr. Lewis' testimony been accepted, petitioner would have been acquitted. The acceptance of Dr. Mathews' testimony commanded petitioner's conviction. No legitimate question can be raised about the sufficiency of the Government's evidence at petitioner's court-martial. The main thrust of petitioner's complaint has always been that the court-martial and the Board of Review were mistaken in accepting Dr. Mathews' testimony rather than that of Dr. Lewis and that a re-evaluation of the testimony be undertaken by this Court.

■ Even under the broad direction given us by the Court of Appeals we are confident that we cannot reweigh the evidence adduced at the court-martial. It could well be true that had we been sitting as the trier of the facts in the military proceedings that the testimony of Dr. Lewis might have been more persuasive to us than it proved to be to the military authorities. But the making of such an assumption is of no avail to petitioner in this proceeding for habeas corpus. Under the broadest construction of the Court of Appeals' direction of remand we can not conceive that we are to do more than determine whether any of petitioner's constitutional rights were violated in the course of his trial before the military court. We cannot find that they were. We must and do find that the Board of Review's statement that petitioner's competency at the time of trial was not in issue was a fair and accurate statement. Indeed, all the facts and circumstances shown by the record in the case require a finding that any effort to have injected such an issue into the court-martial trial would have been frivolous, within the precise legal meaning of that word.

We also find and determine that the testimony of Dr. Mathews was sufficient to sustain the findings of fact made by the military authorities and that the acceptance of that testimony by the military authorities did not deprive petitioner of any of his Constitutional rights. We make a like finding in regard to all of the other assignments of error urged by petitioner before the Board of Review and determine that petitioner was not deprived of any Constitutional right in connection therewith.

No Possible Issue Relating to Petitioner's Trial Competence Was Raised on the Face of Any Other Portion of the Record of the Military Proceedings

The record shows that petitioner's efforts to obtain a further appellate review by the United States Court of Military Appeals was unsuccessful (Exhibit D-2, page 5). An excellent and lengthy petition for grant of review and a brief in support of that petition were filed on petitioner's behalf by Lt. Flanagin, Mr. Furbee and Lt. Col. Ralph Herrod of the Office of the Judge Advocate General, who joined with them in their preparation of that petition and brief, (see pages 22 to 49, inclusive, of Exhibit D-2 for those documents).

That petition and brief, of course, made no mention of any possible issue concerning petitioner's competency at the time of trial. Nor was any such suggestion made in connection with any of the other documents submitted on petitioner's behalf in support of various clemency applications made to higher military authorities.

In addition to Exhibit Q, the affidavit of petitioner's parents submitted to the Secretary of the Army, to which we have already made reference, see also Exhibit M in the record of this case, which was in fact Exhibit No. 1 attached to the parents' affidavit; Exhibit AA in this case, which was in fact Exhibit No. 2 attached to that same affidavit; and Exhibit BB in this case, which was also attached to Exhibit Q (the parents' affidavit) when that affidavit was filed with the Secretary of the Army. Exhibits P, R, and P, all dated in October, 1959, were obviously

submitted to the military authorities as supplemental data along with Exhibit Q.[19]

#### Consideration of Evidence Adduced in this Habeas Corpus Proceeding Which Was Not Considered by the Military Authorities

Additional evidence is in the record in this habeas corpus proceeding pursuant to the Court of Appeals' order of remand that was not considered by the military in its handling of petitioner's case. Exhibit A contains the classification study and other reports made by the Bureau of Prisons at the United States Penitentiary at Lewisburg, Pennsylvania (petitioner was transferred to Lewisburg on December 19, 1959) and copies of progress reports concerning petitioner at Springfield Medical Center where he has been confined since November 30, 1961.

Other exhibits relate to current comment on the court-martial proceedings by three of the participants: Lt. Blair, petitioner's chief defense trial counsel; Dr. Lewis, petitioner's principal medical witness; Dr. Mathews, the prosecution's principal witness; and the comment of doctors presently or recently located at the Medical Center. All of the evidence in this group of exhibits was collected after the decision of the Court of Appeals.

#### Review of Bureau of Prison's Psychiatric Examination of Petitioner

The Chief of the Psychiatric Service, Dr. Manly B. Root, at Lewisburg, in his Psychiatric Report dated January 11, 1960, stated:

"I have studied the voluminous record in the Central File, including excellent Army and other psychiatric reports. Although schizophrenia has been suggested, I believe that the majority opinion agrees with mine—which is that there is no frank psychosis. Sociopathic personality has also been suggested, but this unfortunate man's maladjustment is far more deepseated. It is noted that the Court Martial, after considering all the psychiatric testimony, decided that this man was sane, competent, known [sic] the difference between right and wrong, and was able to assist in his own defense * * *.

\* \* \* \* \* \*

"While I am sure he is not psychotic, I am equally sure that he is likely to become psychotic, because of the impossibility of solution of his tragic psychosexual conflicts. He is a very real menace to others, and there is also grave danger of suicide.

"I suggest therefore transfer to the Medical Center as a seriously disturbed and dangerous victim of sexual neurosis. I suggest that he remain in administrative segregation until transfer can be effected." (Exhibit A, page 28).

Transfer to the Medical Center was not approved at that time. After a number of incidents, however, transfer was again recommended (see page 17 of Exhibit A) and petitioner eventually was sent to the Medical Center. While Dr. Charles Keith, Staff Psychiatrist at the Medical Center, found that petitioner's "perception still appears to be grossly intact and he is well oriented," nevertheless, he believed that petitioner's condition should be diagnosed as schizophrenic reaction. Dr. Keith, in his report of his mental

---

19. Exhibit K, a copy of petitioner's Navy medical data; Exhibit L, a copy of his enlistment papers in the Army Reserve, to which was attached copy of his medical examination for that purpose; Exhibits U and V, relating to his early commitment to Huntington State Hospital in 1953; Exhibit W, concerning petitioner's 1954 examination at the Cleveland Clinic; and Exhibit X and CC relating to petitioner's academic difficulties in public school and at the Hargrave Military Academy, all relate to matters of which the military authorities had full knowledge as is revealed by a review of the petitioner's personal history in any one of the numerous psychiatric examinations to which we have already referred.

status examination of petitioner dated January 3, 1963, stated:

"To briefly summarize, the patient appears to be currently suffering from a severe schizophrenic process. This has probably been going on for many years; the sociopathic front that the patient is able to put up at times crumbles away easily when he is anxious and frustrated because of various things. When this crumbles away, he is extremely regressed, infantile, and autistic and his fragile ego is unable to control his primitive erotic and aggressive impulses." (Exhibit A, page 13).

Petitioner's First Annual Military Clemency Review submitted to the Military Clemency Board on March 7, 1962, stated:

"Swisher's history elicits a life long inability to adequately adjust in almost all areas. He appears to have excessive psychosexual confusion, as well as sadistic-aggressive urges, especially towards females. * * * Based on his past history, he appears to represent an individual with an extreme need for closer limits and controls to compensate for his inadequate internal controls. If insufficient controls are not provided, the patient should be considered dangerous." (Exhibit A, page 6).

In petitioner's Annual Military Clemency Review submitted on March 13, 1963, the psychiatric report of Dr. F. W. Coons, Staff Psychiatrist at the Medical Center, stated:

"This patient remains seriously mentally ill and in need of continued psychiatric hospitalization. He was just recently transferred from the maximum security section to a semi-open ward, but is making only marginal adjustment there. Do not feel this patient is ready for release to society." (Exhibit A, page 4).

And petitioner's most recent Military Clemency Review, dated November 6, 1963, states:

"Since Swisher's last Military Clemency Review under date of March, 1963, he has continued to work in our Storeroom making gradings that fluctuate between average and above average. * * * From January, 1963 till August, 1963 Swisher resided on a psychiatric unit offering close supervision. It was thought that he was ready to use a more open ward and in August, 1963, he was transferred to one offering but medium supervision. The ward officer states that his adjustment, both with personnel and patients has been satisfactory.

* * * * * *

"Aside from Swisher's institutional adjusting, the most remarkable aspect of his stay here, at least the past few months, has been his intense strivings and interest in litigation and attacking his case. He has developed a quite suspicious attitude about personnel 'interfering' with his case and has complained of such both to his lawyer and court judge. He refuses to mail any correspondence or documents straight to his lawyer but uses the court as an intermediary. (The Court has agreed to do this.) * * * In summary it appears that this patient has progressed during the past year, especially as his prior adjustment is reviewed when it was necessary to house him on one of our maximum security units. In recognition of such behavioral advaning [sic], he received Meritorious Good Time effective October 1, 1963." (Exhibit A, page 1).[20]

We find and determine that none of the psychiatric reports made by the Bureau of Prisons suggest or warrant any finding

20. We do not know whether the action taken by the Adjutant General on April 24, 1964, cutting petitioner's sentence from 25 years to 23 years was based on this report. At any rate, Exhibit DD shows that such action was in fact taken and that petitioner's original 30 year sentence has now been reduced a second time to a present sentence of 23 years.

that the petitioner was not competent to stand trial at his court-martial. Indeed, we find all those reports consistent with the prior psychiatric and legal judgments that we have heretofore discussed.

### Review of Evidence Other Than Direct Psychiatric Evidence Introduced In This Habeas Corpus Proceeding

The Court of Appeals' opinion handed down on January 13, 1964, set off a flurry of activity by counsel for both sides. After January 13, 1964, both sides endeavored to get something in the record upon which to base argument in regard to the "possible issue" that the Court of Appeals thought might be presented in regard to whether petitioner's competency to stand trial had been constitutionally adjudicated.

On February 6, 1964, a letter signed by Dr. Jesse D. Harris, the present Warden and Chief Medical Officer of the Medical Center, in obvious response to a letter written by Lt. Col. Abraham Nemrow of the Office of the Judge Advocate General, stated:

> "In reviewing testimony of the Army psychiatrist who stated that Swisher was insane at the time of the trial having a diagnosis of schizophrenic reaction, and with his period of observation at the Medical Center, it is our opinion that the Army psychiatrist was correct. * * * Even though the present psychiatrists agree with Dr. Lewis who examined him in 1958, they recommend continuous and immediate psychiatric treatment in an institution where he could not become in conflict with society. The prognosis for recovery and discharge from a psychiatric hospital is considered remote and very unlikely." (Exhibit N).[21]

It is quite apparent from Dr. Harris' letter (and from the replies made to other letters written by Lt. Col. Nemrow at approximately the same time which we will presently discuss) that Lt. Col. Nemrow's inquiry did not focus precise attention on the narrow point relating to petitioner's alleged competency at the time of trial. Or, at least the language used in Dr. Glotfelty's affidavit (Exhibit E), which was repeated in the letter signed by Dr. Harris, to the effect that "it seems in all probability, with his course since the time of trial in 1958, that he was incompetent at the time of trial" reveals that the recipients of Lt. Col. Nemrow's letter did not focus precise attention on the "possible issue" suggested in the Court of Appeals opinion.

Similar looseness of language, or perhaps even of concept, is illustrated by the language in the letter signed by Dr. Harris (Exhibit N) when it stated that "Swisher was insane at the time of trial having a diagnosis of schizophrenic reaction." As we have pointed out above, petitioner could well have had a correct diagnosis of schizophrenic reaction and therefore be "insane at the time of trial", in the sense that he was then mentally ill; but it could be and was in fact true that petitioner was perfectly competent to stand trial in that he could understand the nature of the proceedings against him and he properly could assist in his own defense.

It is also apparent from what we already have said that the fact that Dr. Glotfelty agreed with Dr. Lewis' initial diagnosis of schizophrenic reaction is quite unimportant so far as this case is concerned. All that fact establishes is that had Dr. Glotfelty been the trier of the facts he would have voted acquittal. As we have already intimated, we are not at all sure that we would not have voted the same way had we been sitting as the trier of the facts; but that fact is equally irrelevant. Neither we nor Dr. Glotfelty have power to reweigh the evidence adduced at the court-martial. We find that the evaluation of Dr. Glotfelty

---

21. It is obvious from the initials on the letter "JDH:HWG:rg" and from Exhibit E, an affidavit of Dr. H. Wayne Glotfelty, Chief of the Psychiatric Service at the Medical Center, that Dr. Glotfelty dictated Exhibit N for Dr. Harris' signature.

and its adoption by Dr. Harris does not sustain a finding in support of petitioner's claims.

### Review of Dr. Mathew's Recent Affidavit

An affidavit was obtained from Dr. Mathews. Not unexpectedly, he stated:

"In my examination of this subject on or about 19 August, 1958, I was unable to demonstrate any findings indicating that he did not possess sufficient mental capacity to understand the nature of the proceedings against him, and to cooperate intelligently in his defense.

"I was unable to demonstrate that he did not possess such requisite mental capacity.

"I was unable to demonstrate that he did not have the ability to discuss his case intelligently with his counsel and to appreciate and understand what was taking place in the courtroom."

Such evidence, of course, does not support petitioner's claims.

### Review of Dr. Russell O. Settle's Evaluation of Petitioner's Mental Condition

Interestingly enough, evidence adduced by petitioner directs the clearest light on the problems involved in petitioner's case and cases like it. It is evident that defense counsel asked Dr. Russell O. Settle, presently Regional Program Director, Mental Health Services of Region VI of the Public Health Service, but formerly Warden and Superintendent of the Medical Center from 1957 to 1963, to review petitioner's case.

Dr. Settle's report of March 3, 1964, indicated that he would probably concur in the diagnosis of schizophrenic reaction as of the time of the offense as initially made by Dr. Lewis and presently concurred in by Dr. Glotfelty.[22]

Dr. Settle, whose experience acquainted him with literally hundreds of court proceedings, read the full transcript of the court-martial trial. He reached exactly the same conclusion as did the Board of Review and all other persons who were active participants in the events as they happened in regard to the absence of any issue on the face of the court-martial record that related to petitioner's trial competency. Dr. Settle's comment on the court-martial record was stated in the following language:

"At Swisher's court-martial one psychiatrist testified that he was schizophrenic and irresponsible, and another to the contrary. *His competence to stand trial was not questioned (stipulated by both sides).* Retrospectively, an unbiased psychiatrist, knowing of subsequent developments and findings, could now do no less than interpret his whole career, including the assault, as being manifestations of a developing mental illness of increasing severity and magnitude. More than this he probably should not attempt. Criminal responsibility and competence are legal concepts; issues for adjudication by court or jury. They should not be decided by psychiatrists." (Exhibit Z, page 1, emphasis ours).

22. The first paragraph of Dr. Settle's report reads "Review of Swisher's Medical Center file, from the psychiatric case-history point-of-view, reveals the rather typical longitudinal life adjustment pattern of schizophrenia, with strong paranoid features. The maladjustment, aggressive outbursts, withdrawal, sexual confusion, poor judgment, misinterpretations of reality, blackouts, emotional dyscontrol, etc., described as beginning in childhood and increasing during adolescence, are classical, and could have been predictive of the eventual diagnosis and the assault. After a turbulent and completely inadequate childhood and youth, adjustive failures in school, armed services, employment, home life; and at least one commitment to a mental hospital, numerous psychiatric and psychometric evaluations, a court-martial for assault and a sentence to 30 years, his career culminated in a diagnosis of Paranoid Schizophrenia, after eventual admission to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri in 1961, at the age of 23."

Dr. Settle's use of the words "criminal responsibility" and "competency" to stand trial were used in an experienced and in a careful and precise sense. This is made clear by another comment made by Dr. Settle in his initial analysis of this case. On page 2 of Exhibit Z, Dr. Settle stated:

"If I may be permitted to violate my own conviction that psychiatrists should not express opinions on issues of competency and responsibility, it seems very likely to me that, if the court martial finding that he was responsible at the time of the offense (knew the difference between right and wrong) was a valid one (and this is not now contested) then he was very likely not sufficiently ill to be incompetent." [23]

Defense counsel, recognizing the implication of what Dr. Settle had suggested, hopefully asked him for further clarification. In a letter to defense counsel dated March 24, 1964, Dr. Settle reiterated his conclusion that there had been no testimony in regard to petitioner's competency to stand trial. He stated:

"I have read the testimony of Captain Alfred B. Lewis Junior and Captain Margaret Mackintosh given at the time of Swisher's Court Martial. It is clear that both considered Swisher schizophrenic. *There is an absence of any testimony or reference to the issue of whether or not*

*he was at the time competent to understand the proceedings against him.* (Exhibit O, emphasis ours).

Dr. Settle then speculated as to what sort of retrospective opinion would be expressed by Dr. Lewis if he was, for the first time, now asked to express an opinion in regard to petitioner's competency to stand trial at the time he was tried by the court-martial. Dr. Settle stated:

"If this issue is now to be raised is would appear that the most reliable witness would be Captain Lewis, a psychiatrist. He was there, he knew, observed, and examined Swisher. His psychiatric judgment, in my opinion, would be more reliable than any subsequent examiner's attempt to make a retrospective judgment. *My guess is that he would testify that he was competent. The mere absence of any reference to the issue suggests to me that there was tacit assumption on the part of all involved that Swisher was aware of what was going on, had conferred with counsel adequately, and understood the proceedings."* (Exhibit O, emphasis ours).

We, of course, pursuant to the direction of the Court of Appeals, have drawn the same inference that Dr. Settle drew from the fact that no real reference to petitioner's competency to stand trial was apparent on the face of the record; which is that no real question about that matter could be said to exist. Both Dr. Settle's

---

23. Dr. Settle spells out in detail the vast difference between "competency to stand trial", meaning defendant's ability to understand the nature of the proceedings and properly to assist in his defense, and "criminal responsibility," meaning defendant's criminal responsibility for the commission of the alleged offense, in an excellent article co-authored with Dr. Charles P. Oppegard entitled "The Pretrial Examination of Federal Defendants", reprinted in 35 F.R.D. 475. On page 479–480, he stated: "It is apparent from our appraisal of reports of such examinations [referring to examinations made by psychiatrists who are unfamiliar with court procedures], currently being made that there is confusion surround-

ing the concept of 'competence to stand trial', and its differentiation from mental illness and criminal responsibility. * * * In too many cases the examining psychiatrist tends to 'throw the book' at the patient; he is likely to say that he is 'legally insane, doesn't know the difference between right and wrong, doesn't understand the nature and quality of the act or the proceedings against him, *and is incompetent to assist in his defense'.* * * * Subsequent re-evaluations, after commitment, not infrequently fail to confirm a sufficient degree of mental illness to justify abrogating defendant's right to trial." (Page 479–480 of 35 F.R.D., emphasis ours).

conclusion that there was in fact a "tacit assumption on the part of all involved that Swisher was aware of what was going on, had conferred with counsel adequately and understood the proceedings," and his guess as to what Dr. Lewis would have testified to if the issue of petitioner's competency to stand trial had been raised at the court-martial trial proved to be accurate.

Review of Dr. Lewis' Post—Court of Appeals Opinion Correspondence with Counsel for Both Parties

Both Dr. Lewis and Lt. Blair received letters from Lt. Col. Nemrow shortly after the decision of the Court of Appeals was handed down.

Dr. Lewis' answer, in affidavit form dated February 6, 1964, confirmed that the question of petitioner's competency was never raised at the court-martial. He stated:

"My answer to the Law Officer's question referred to the accused's ability to adhere to the right concerning the offense with which he was charged, and did not refer to the question of his capacity to understand the proceedings against him and to cooperate intelligently in his defense. *This latter question was never raised that I can recall.*" (Exhibit G.)

Lt. Col. Nemrow evidently asked Dr. Lewis how he would have answered had the question been asked. Dr. Lewis said that "in retrospect, I find it difficult to formulate how I would have answered this question if it had been raised;" and then added, we think significantly, that:

"*The accused did possess sufficient mental capacity to understand the nature of the proceedings.* In his statements to me, he was clearly aware of the possibility of his receiving a long jail sentence. However, his emotional state was such as to raise serious question as to his ability to cooperate intelligently in his defense. He spoke freely and proudly to anyone of his offense, and at times, in his statements to me, it seemed he wanted to be convicted. Whether this should be construed as meaning he was unable to cooperate in his defense is a question I cannot answer, and one which I think would have to be decided on the basis of his behavior with his defense attorneys and during the proceedings." (Exhibit G, emphasis ours).

Mr. Wickersham, petitioner's present counsel, also wrote Dr. Lewis. Dr. Lewis replied on February 13, 1964, that he remembered "the case of Thomas Swisher very well because at the time I thought the conviction was a mistake" (Exhibit T, page 1). He added that "with the additional experience that I have had since the time of Swisher's court marshal [sic], I would if anything, be more confident of my diagnosis."

Dr. Lewis sent to Mr. Wickersham a copy of his letter to Lt. Col. Nemrow dated February 6, 1964 and evidently he also sent a blind copy of his letter to Mr. Wickersham to Lt. Col. Nemrow. At any rate, Dr. Lewis, under date of March 12, 1964, wrote another letter affidavit to Lt. Col. Nemrow "to clarify my affidavit of February 6, 1964" (Exhibit H). In that letter he stated:

"My statement that the question of Swisher's capacity to understand the proceedings against him and to cooperate intelligently in his own defense was not raised, refers only to the court-martial itself. I believe that the question was raised by the defense attorney in a pre-trial discussion with me, but I do not specifically recall the content of this discussion. *It is probable that I answered the defense attorney's questions by stating that I thought Swisher was capable of cooperating intelligently in his own defense.*" (Exhibit H, emphasis ours.) [24]

24. It is entirely possible that Lt. Colonel Nemrow did not receive a copy of Dr. Lewis' letter to Mr. Wickersham of February 13, 1964. Lt. Col. Nemrow may have written Dr. Lewis independently to confirm whether or not Lt. Blair's state-

There is nothing in Dr. Lewis' most recent testimony that can be said to support petitioner's claims in the pending habeas corpus proceeding. We so find.

### Review of Lt. Blair's Comments On His Conduct of Petitioner's Defense at the Court-Martial Trial

We at long last reach Lt. Blair's post mortem comment concerning his conduct of petitioner's defense before the court-martial. In response to the letter Lt. Col. Nemrow wrote him shortly after the Court of Appeals' decision, Lt. Blair replied in part on February 12, 1964 as follows:

"I will tell you that the defense of mental incompetence to stand trial was not raised because it simply was not available. The man had confessed endlessly. It was obvious that he remembered what he had done, understood that it was wrong, and anticipated punishment. Moreover, my own witness, Captain Lewis, asserted without qualification that Swisher was sane enough to stand trial. What could have been more damning than to raise the issue and lose it at the hands of my own witness?" (Exhibit I, page 1).

Lt. Blair quite accurately and forthrightly suggested that the choice of language used in the decision of the Board of Review that "it was *expressly stipulated* that there was no issue of insanity at the time of trial"—might not have been technically accurate. In that regard he stated:

"It is somewhat inaccurate to say that we stipulated to his competency. I hadn't intended to mention the matter at all. I'm certain it hurt my case to concede the point. However, you know as well as I that a military court will—and must, I suppose—make elementary inquiries into the defense counsel's competence. I was asked and had to answer. This is one case where such an inquiry hurt more than it helped." (Exhibit I, page 1).

Lt. Blair concluded his letter with a statement that he would be glad to supply an affidavit; an offer that was accepted. Exhibit J is an affidavit of Lt. Blair executed February 27, 1964. After stating that "I have been asked to give an affidavit concerning (1) my reasons for not raising this issue and (2) my own impressions of Swisher during the trial and during pre-trial conferences, to establish whether or not he understood the nature of the proceedings against him and was able to participate in his own defense." (Exhibit J, page 1), Lt. Blair stated:

"After talking to Swisher, I talked with the victim. I could see that she would make a good witness. She spoke clearly, was attractive and intelligent, and would raise the sympathy of the Court. Her jaw, which had been broken, was still wired together.

"She was positive in her identification, and I could see no way to cast any effective doubt on it. Swisher was 6-4, 265 pounds, myopic and his head had an unusual shape. I had never before seen anyone who looked like him. Neither had the girl. Probably no one on the Court would have either. And there were Swisher's confessions to deal with." [25]

---

ments concerning his pre-trial interviews with Dr. Lewis (to be presently detailed) were accurate. Regardless of what may have prompted Dr. Lewis' letter quoted above, it is obvious that it does generally confirm Lt. Blair's statements concerning his interviews with Dr. Lewis. We so find.

25. In another paragraph of his affidavit of February 27, 1964, Lt. Blair stated

the following concerning those confessions: "I had also to contend with the matter of Swisher's confessions. While he was still at large he had written his first confession in his own hand. I am not certain, but I believe that this was found on his person when he was apprehended. He also confessed to the State Patrolman who apprehended him, to the County Sheriff who detained him, to the C.I.D. man who returned him to

In regard to what he did concerning petitioner's defense of insanity, Lt. Blair stated:

"I began to consider the defense of insanity. Swisher had been transferred to the psychiatric ward from the stockade and I hoped that there would be a favorable diagnosis. Captain Lewis, the post psychiatrist, said Swisher was schizophrenic. His observations, though, were not completely favorable. For one thing, he was of the opinion that Swisher had been faking some of the unusual behavior which caused him to be sent to the psychiatric ward in the first place. And Captain Lewis said that Swisher was not out of touch with reality, that he had good recall, knew right from wrong, understood that he might well be severely punished, but that he was 'insane' in that at the time of the alleged offense, he could not make himself adhere to the right." (Exhibit J, page 2).

Lt. Blair stated positively that he specifically explored the question of whether petitioner's competency to stand trial was a possible issue that should be raised and decided against doing so for the following reasons:

"I asked Captain Lewis specifically about Swisher's ability to stand trial. I explained the legal test to

Fort Jackson, to the C.I.D. men who questioned him, to the Confinement Officer, to guards and to fellow prisoners. He asked these questions: (1) When am I going to be tried?, and (2) How much time can I get? I know nothing of the psychiatric significance of these many confessions, but I know their probative value. It would have been difficult to convince anyone that Swisher couldn't tell me what he had already told so many others, or that he couldn't understand the nature of the proceedings against him when he had asked so many times the date of his trial and how much time he could get. I knew that if the issue was raised, these witnesses would be called against me." (Exhibit J, page 2).

26. Lt. Blair made another affidavit on May 6, 1964 after he had seen a copy of peti-

him. He said Swisher could stand trial, under that test. He was particularly impressed that Swisher had perception enough to realize that being diagnosed insane would be beneficial, and had sense enough to fake some fairly convincing symptoms to get himself transferred to the psychiatric ward. I learned that the prosecuting attorney had asked the same questions and gotten the same answers, except that he was not told about the faked symptoms. This minor deception was not deliberate on Captain Lewis' part. The prosecuting attorney simply didn't ask enough questions. Fortunately, none of this was ever brought out, though I'm certain that it would have been if competence to stand trial had been put in issue." (Exhibit J, page 2).

In summary, Lt. Blair stated:

"I assert, without qualification, that the defense of lack of competence to stand trial was not raised because, as a matter of evidence, it simply was not available." (Exhibit J, page 3).[26]

### Finding of Ultimate Fact and Ultimate Conclusions of Law

In response to the direction of our Court of Appeals we have searched for

tioner's amended petition for habeas corpus in which Lt. Blair's conduct was put under mass attack. That affidavit is Exhibit EE of this record. In it, in even greater detail than his affidavit of February 27, 1964, Lt. Blair explained that, for example, he had followed the lead given him by the petitioner "that he had been treated in a mental hospital in his home State" by taking with both Dr. Lewis and Dr. Mathews only to find out, as was later confirmed by their testimony, that both doctors already had the record of petitioner's earlier treatment. Lt. Blair's affidavit of May 6, 1964, also details his search for witnesses and reveals full discharge of his professional duty to petitioner.

We do not deem it necessary to comment further on the affidavit of May 6, 1964, other than to say that it establishes beyond question that Lt. Blair's

the possible issue it found might be present in regard to petitioner's mental competency to stand trial. On the basis of our review of all the facts and circumstances contained in the record before the military authorities and those adduced in evidence since remand, we find that, on the facts, petitioner was fully competent to stand trial; and, on the law, the recognition of that fact by all persons concerned without putting the question in specific issue did not violate any right guaranteed petitioner by the Constitution of the United States.

We further find and determine that petitioner was vigorously and ably represented by the five defense attorneys who represented him before the court-martial and the Board of Appeals. We find that he has been vigorously and ably represented by his present attorney before us and before the Court of Appeals. It follows that petitioner has not established the existence or carried the burden incident to the possible issue suggested in the Court of Appeals' opinion.

### Petitioner Has Not Sustained Any Other Ground for the Issuance of the Writ

██ We turn now to the other grounds for relief alleged in petitioner's

first amended petition for writ of habeas corpus.[27]

Paragraph 4a of petitioner's amended petition was the paragraph in which petitioner raised the question of his incompetency to stand trial. The other allegations of petitioner's amended petition complain about factual determinations made on conflicting testimony concerning petitioner's competency at the time of the offense; about an alleged inadequacy of the pre-trial investigation of petitioner's background as it related to his mental condition; about the alleged inadequate and poor handling of petitioner's defense by his counsel; about the admission and exclusion of evidence; about alleged violations of certain rights under the Uniform Code of Military Justice; and about an atmosphere of extreme bias and prejudice against petitioner in connection with the court-martial trial.

Present counsel for petitioner fairly states that "the enlargement of petitioner's claims as set out in his Amended Petition are in compliance with the Court's suggestions * * * that all complaints relative to competency, due process and constitutional rights be set out so that all matters may be determined once and for all" (page 4 of petitioner's suggestions in support of peti-

---

representation of the petitioner is beyond legitimate criticism. Lt. Blair must accept philosophically Judge Arnold's observation in Diggs v. Welch, D.C.Cir. 1943, 80 U.S.App.D.C. 5, 148 F.2d 667, at 669, that "[t]he opportunity to try his former lawyer [in a habeas corpus proceeding] has its undoubted attraction to a disappointed prisoner." He should also remember that immediately after the trial of the court-martial that petitioner told Lt. Col. Witcover he had "complete satisfaction with his defense counsel and the conduct of the trial" (Exhibit D–2, page 128). This Court finds that he should have.

27. When former petitions for habeas corpus involving the military prisoner here before us were ruled we were of the opinion that the restricted scope of review permitted under the rule of Burns v. Wilson, supra, required that we rule those cases on the allegations contained

in petitioner's petition for habeas corpus. The form of the remand of this case by our Court of Appeals clearly indicates that its determination that it was of the opinion that we should have read Burns more broadly. We therefore make factual determinations, not only in regard to the competency to stand trial issue suggested in the Court of Appeals opinion, but we shall also definitely rule all the other grounds alleged in petitioner's amended petition. Basically, the additional grounds involve matters that the military had not "manifestly refused to consider" (page 142 of 346 U.S., page 1049 of 73 S.Ct.). Indeed, the record shows, and we so find, that the military authorities did, in fact, fairly and fully consider all the additional grounds alleged and that the adverse determinations made against petitioner in connection therewith did not deprive petitioner of any of his Constitutional rights.

tion for habeas corpus). No evidence was adduced by petitioner in specific support of any of those additional allegations. All of the evidence introduced in this habeas corpus proceeding that was not some part of petitioner's military proceedings or data seen and considered by the military authorities related to and revolved around petitioner's mental condition and the possible issue of petitioner's competency to stand trial, all of which we have fully discussed above. The additional grounds for relief alleged in petitioner's amended petition were not the subject of extended discussion in any of the briefs filed by the parties.

In order to make certain all possible evidence had been adduced, we stated at a hearing held January 7, 1965, that such "hearing was scheduled in order to simplify the legal issues involved and to explore the possibilities of obtaining agreement from both parties that will avoid the necessity of any additional hearing for the purpose of the introduction of additional testimony or additional documentary evidence of any sort." (page 2 of transcript of proceedings).

After noting that we had read the stipulations and briefs filed by the parties we stated that we "did not want to enter upon a final consideration of the case until I could ascertain whether all of the factual data that either party might wish to adduce is in the record, and * * * I repeat that the purpose of the session this morning is to ascertain whether either party wants to introduce any more evidence of any sort before the Court should consider the case as being submitted" (page 3–4 of transcript of proceedings).

Counsel for petitioner stated:

"MR. WICKERSHAM: My position is that as to the sustaining or denial of our application for writ, that there is in the evidence now for the Court all of the material that is necessary for the determination of that, because I look at it that the determination is as to two things; one, at the time of the occurrence,

and, secondly, at the time of trial, and I don't think, for a determination of the writ, whether it should issue or not, I don't think anything particularly as to present condition, attitude, and the like, I don't think that plays a part in that." (page 5 of the transcript of proceedings).

Counsel for the Government stated:

"MR. SPOTTSVILLE: It is our feeling that with the stipulations, the initial stipulation and the supplemental stipulation, and the exhibits attached thereto * * * cover thoroughly all the issues involved. * * * We feel that the matter is fully covered, and adequate information has been supplied, both the factual and legally, for the Court to make a determination of the issues here involved." (page 7 of the transcript of proceedings).

After again confirming that neither wanted to introduce any further evidence, that both wanted the Court to consider the case as finally submitted on the merits on the basis of the exhibits attached to the stipulations, and that neither party wished to file any more briefs (pages 8 to 10 of the transcript of proceedings), Mr. Wickersham added the following for the record:

"MR. WICKERSHAM: I merely want to add one thing: I have taken into consideration the presentation of the petitioner, Mr. Swisher, * * * I don't feel that * * * would be of any real assistance inasmuch as it is so thoroughly covered by people who are more objectively able to report than he. But I merely want the record to show that I have not overlooked that fact." (page 10 of transcript of proceedings).

In view of the manner in which petitioner has dealt with all the additional grounds alleged in petitioner's amended petition, we believe it necessary to state that we have independently considered those additional grounds and need to make only broad and general findings and conclusions in regard to all those other grounds.

We therefore find and determine in connection with all grounds alleged in petitioner's amended petition other than those we have specifically discussed in detail that petitioner offered no evidence and failed to sustain the burden of proof imposed by law as to all such grounds alleged. We further find and determine that defendant was given a fair trial and that he was not in any way deprived of any of his Constitutional rights.

For the reasons stated, petitioner's amended petition for writ of habeas corpus should be and is hereby denied.

It is so ordered.